UNITED STATES, Appellee

v

ROGER M. WHEELER, Machinery Repairman Fireman
Apprentice, U. S. Navy, Appellant

12 USCMA 387, 30 CMR 387

\* *Lieutenant Colonel Remmel H. Dudley*, USMC, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel R. G. Coyne*, USMC.

*Major Elvin R. Coon*, USMC, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Martin Drobac*, USNR.

## Opinion

ROBERT E. QUINN, Chief Judge:

A special court-martial convicted the accused of unauthorized absence, in violation of Article 86, Uniform Code of Military Justice, 10 USC § 886, and failure to obey a general regulation prohibiting marriage in the Philippines, without the written permission of the Commander, U. S. Naval Forces, Philippines, in violation of Article 92, Uniform Code of Military Justice, 10 USC § 892. At trial, and again before the board of review, the accused contended the regulation was invalid in that it constituted an unlawful restraint on his personal right to marry. The contention was overruled. We granted review to consider the correctness of the ruling.

Both parties agree on some general principles. They agree that a military order or regulation is legal if it protects or promotes morale, discipline, good order, and the usefulness of the command. United States v Martin, 1 USCMA 674, 5 CMR 102. They also agree that an order of the kind mentioned may reasonably limit the exercise of a personal right. United States v Martin, supra; United States v Milldebrandt, 8 USCMA 635, 25 CMR 139; see also United States v Wilson, 12 USCMA 165, 30 CMR 165. There is sharp disagreement, however, on the reasonableness of the instant regulation.

The present regulation is a revision of a previous regulation on the subject which a board of review held to be illegal. United States v Nation, February 21, 1958 (WC NCM 57–01899).

On certificate for review by The Judge Advocate General of the Navy, we affirmed that decision. United States v Nation, 9 USCMA 724, 26 CMR 504. The Government maintains that the provisions of the earlier regulation, which were found to constitute an unreasonable and arbitrary restraint on the personal right to marry, have been eliminated in the revised regulation, and that, as presently worded, the regulation is a wholly reasonable limitation of the individual's freedom of action in a command located on foreign soil. On the other hand, the accused contends that, even as redrafted, the regulation violates his rights under the United States Constitution, and bears no reasonable relation to military duty. Six separate grounds of invalidity are alleged.

First, the accused contends that the regulation is an intrusion into religious practices and cannot be asserted against a civilian. The contention is predicated upon a provision requiring the military person seeking permission to marry and the prospective spouse, who might be a civilian, to meet with a military chaplain. The chaplain is required to "advise and counsel both parties on the sanctity of marriage, the seriousness of the marriage contract, and, if applicable, the potential difficulties in inter-racial marriages." COMNAVPHIL INSTRUCTION 5800.1 E, November 5, 1958, paragraph 5. Both branches of the argument lack merit. Paragraph 4 expressly limits applicability of the regulation to per-

sons "subject to the jurisdiction of Article 2, Uniform Code of Military Justice, with the exception of reserve personnel on inactive duty and retired personnel." 10 USC § 802. Operation of the regulation upon a prospective civilian spouse is wholly incidental to its regulation of military personnel. Civilian conduct may be circumscribed by the conduct of military personnel in response to lawful orders, but that consequence does not transform a lawful order into an unlawful one. United States v Martin, supra; see also United States v Silva, 9 USCMA 420, 26 CMR 200. As far as religious liberty is concerned, there is absolutely nothing in the fact, or in subject-matter, of the interview that interferes with the exercise of the applicant's religious beliefs. True, the regulation speaks of the sanctity of marriage, but the reference does not purport to establish the place of marriage in the religious beliefs of a particular applicant. Marriage is basic to all societies, and the United States Supreme Court has said that it is in "its very nature a sacred obligation." To remind, or to inform a person of the fundamental nature of marriage is not to promote or to interfere with his religious beliefs. Nor does the requirement of an interview with the chaplain violate the constitutional prohibition against "an establishment of religion." However high or thick the wall of separation between church and state, the interview provision does not breach that wall. It does not force, influence, or encourage the applicant to profess any religious belief or disbelief. Cf. Everson v Board of Education, 330 US 1, 91 L ed 711, 67 S Ct 504. It simply requires the chaplain, whose special training and background indicate his qualifications for the task, to provide information on a matter of great importance to persons who are reasonably expected to need that information. The requirement, in fact, is substantially like the salutary statutory rule that persons entering on active duty shall have "carefully explained" to them certain specially relevant Articles of the Uniform Code of Military Justice, Article 137, supra, 10 USC § 937. It is also like orientation

on current developments in the political and economic fields. It does not compel anyone to change his personal attitudes toward religion or marriage. We discern no basis upon which it can reasonably be said that the chaplain's interview aids or discourages any one religion, all religions, or no religion.

Two other requirements are cited as evidence of the unreasonably restrictive nature of the regulation. These are as follows: (1) Presentation of a medical certificate showing the applicant and the intended spouse to be free from mental illness, infectious venereal disease, active tuberculosis or major communicable disease; (2) written consent from a parent or guardian if the parties are under twenty-one years of age.

The argument in each instance is essentially directed to availability of other means of protecting the health and well-being of the military community than to the reasonableness of the requirements. Suffice it for present purposes to say that the medical requirement relates to patently serious diseases; consequently, if the regulation is otherwise valid, the requirement is entirely reasonable and consistent with usual statutory limitations on the right to marry. The consent provision also has the sanction of common practice. The cut-off age differs from that in civilian jurisdictions, but twenty-one years of age is frequently considered the time of transition from youth to adulthood in the eyes of the law. Consequently, we may put aside further discussion of these requirements to reach the more central question of whether the right of servicemen to marry while serving overseas is the proper subject of reasonable regulation by appropriate military commanders. That question was expressly reserved in the *Nation* case.

Activities of American military personnel in foreign countries may have different consequences from the same activities performed in the United States. United States v Martin, supra; United States v Yunque-Burgos, 3 USCMA 498, 13 CMR 54. What may

**389**

be relatively unimportant in an American environment can be tremendously significant in a foreign background. For example, marriage in the United States to a person having active tuberculosis may not be cause for too great concern because of the availability of medical facilities for treatment, cure, and control of the spread of the disease; but in a foreign community where the medical services may be few, and demands upon the service very heavy, it may be necessary to prohibit military personnel from marrying a civilian suffering from such condition in order to safeguard the health and morale of other military personnel. Other examples of real dangers that might flow from the unrestricted marriage of personnel in foreign countries are readily at hand. We need only say that, in our opinion, a military commander may, at least in foreign areas, impose reasonable restrictions on the right of military personnel of his command to marry.

Finally, the accused contends that, as applied in practice the present regulation is invalid because it █ requires an arbitrary "cooling off period" like that of the predecessor regulation which was condemned in the *Nation* case. The argument is based on the accused's testimony that it takes "approximately three months" for an application to be approved and returned through the chain of command. Additionally, the accused contends that an "irritated" superior, could "easily delay forwarding the paper on through the chain of command." Two circumstances show the lack of merit in the argument. First, the regulation itself contemplates expeditious processing of an application.[1] Secondly, since the accused filed no application at all, he can hardly contend that, as applied to him, the regulation subjected him to an inordinate waiting period between application and marriage. Cf. United States v Voorhees, 4 USCMA 509, 544, 16 CMR 83, dissenting opinion by Judge Brosman; see also United States v Dickenson, 6 USCMA 438, 448, 20 CMR 154.

The decision of the board of review is affirmed.

Judge LATIMER concurs in the result.

FERGUSON, Judge (dissenting):

I dissent.

This case presents but a single issue and that is whether the United States Navy may lawfully require one of its enlisted men to obtain the written permission of his commanding officer in order to marry the woman of his choice. In this instance, the accused's fiancee happens to be a Philippine National, and the order involved applies to marriages in that geographical area. However, under the principles announced by my brothers, it would seem to be equally valid if the woman was an American citizen and the United States the place which the order affected. Surely, considerations of nationality and foreign service in these modern times cannot be used as props to support the legality of an order which would otherwise be void.

Uniform Code of Military Justice, Article 92, 10 USC § 892, which the accused is charged with violating, provides pertinently:

"Any person subject to this chapter who—

(1) violates or fails to obey any *lawful* general order or regulation;

. . . . .

shall be punished as a court-martial may direct." [Emphasis supplied.]

We early recognized and defined the scope of lawful orders and regulations in the armed forces. In United States v Martin, 1 USCMA 674, 5 CMR 102, at page 676, we stated:

". . . All activities *which are reasonably necessary to safeguard and protect the morale, discipline and usefulness of the members of a command and are directly connected with the maintenance of good order in the services* are subject to the control of the officers upon whom the responsibility of the command rests." [Emphasis supplied.]

---

[1] Paragraph 7a reads as follows: "Proper timing is essential to facilitate the expenditious [sic] processing of marriage permission request."

In United States v Milldebrandt, 8 USCMA 635, 25 CMR 139, we unanimously held illegal an order requiring an accused to report his financial condition to his commanding officer while on leave. The basis for our decision in that case was the complete lack of connection between the order and any requirement of the military service. The language used by the Chief Judge in his concurring opinion is illuminating. Thus, he stated, at page 639:

"Persons in the military service are neither puppets nor robots. They are not subject to the willy-nilly push or pull of a capricious superior, at least as far as trial and punishment by court-martial is concerned. *In that area they are human beings endowed with legal and personal rights which are not subject to military order.* Congress left no room for doubt about that. It did not say that the violation of *any* order was punishable by court-martial, but only that the violation of a *lawful* order was. Article 92, Uniform Code of Military Justice, 10 USC § 892." [Emphasis partially supplied.]

In United States v Nation, 9 USCMA 724, 26 CMR 504, we were confronted with the contention that a regulation similar to that now before us was illegal in that it forbade marriage by naval personnel in the Philippines without the permission of the appropriate commander and a postponement of at least six months after the application for such permission. We there did not reach the basic issue now before us, for we concluded that the requirement for a six-month waiting period was both arbitrary and unreasonable. Both the Chief Judge and I, however, thought it appropriate to call attention to the other aspects of the regulation.

Finally, in United States v Wilson, 12 USCMA 165, 30 CMR 165, we held an order illegal which required the accused not to indulge in alcoholic beverages. We stated, at page 166:

". . . In the absence of circumstances tending to show its connection to military needs, an order which is so broadly restrictive of a private right of an individual is arbitrary and illegal."

Under the principles enunciated in the foregoing cases, I think it clear that an order requiring a commander's permission to marry is illegal on its face. There is no holier state and certainly nothing more personal to an individual than his intent to embark upon the matrimonial seas. Its importance in our society is so commonly recognized that the authority of the State to control its commencement and termination has never been seriously questioned. See, generally, 35 Am Jur, Marriage, § 10, and Haddock v Haddock, 201 US 562, 50 L ed 867, 26 S Ct 525 (1906). However, its connection with the morale, discipline, and usefulness of the members of a command or the maintenance of good order and discipline to such an extent that a commander may prohibit it simply does not appear. Indeed, the lack of such a connection has been long recognized by service legal authorities. Thus, Colonel Winthrop notes in his work that an order forbidding a soldier to contract marriage is unlawful. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 575. And it is stated in A Digest of Opinions of The Judge-Advocates General of the Army, 1901, edited by the same author, at page 450:

". . . [U]nder existing law, a military commander could have no authority to prohibit soldiers, while under his command, from marrying; and that the contracting of marriage by a soldier (although his commander had forbidden him, or refused him permission, to marry) could not properly be held to constitute a military offence. Where indeed there is involved in the conduct of the soldier at the time any military neglect of duty or disorder, he may, for this indeed, be brought to trial, but not for the marrying as such. . . . XXXVIII, 47, *April, 1876;* 407, *January, 1877;* XLIII, 109, *December, 1879.*"

To the same effect, see Digest of Opinions of The Judge Advocates General of the Army, 1912, Command, V A 2a.

One need not, however, rely solely

upon the services' precedents. Our decisions, quoted supra, lead to the same result. Thus, we held in United States v Wilson, supra, that a commanding officer may not prohibit a man from drinking and, in United States v Milldebrandt, supra, that he does not have unlimited authority to inquire into an individual's financial affairs. Yet, one's decision to enter upon the state of matrimony must bear the scrutiny of his superiors, even though he is a grizzled noncommissioned officer and they no more than downy-cheeked ensigns and lieutenants. Indulgence in intoxicants and money matters constitute private affairs but, when compared to the institution of marriage, they might properly be called public acts. Matrimony is purely a matter of personal choice, and the opinion of another concerning its merits normally has little bearing on the decision to be made. To demonstrate this truth, one need only refer to the oft-seen failure of parental opposition to their child's union with another whom the parents deem undesirable. In short, it is a matter so personalized and so little related to military and naval affairs, that I am of the opinion it cannot be regulated by requiring the consent of a superior officer.

Turning to the rationale of the principal opinion, one can scarcely argue with the reasonableness of regulatory provisions designed to insure the good mental and physical health of parties intending to marry. Perhaps the question of the age of consent is also a pertinent factor, although it is open to argument in view of the obvious emancipation of any infant who legally and voluntarily becomes a part of the Nation's armed forces. See, for example, Gapen v Gapen, 41 W Va 422, 23 SE 579 (1895); Iroquois Iron Co. v Industrial Commission, 294 Ill 106, 128 NE 289 (1920); and 67 CJS, Parent and Child, § 88.

The regulatory requirement for premarital interviews with a chaplain on the sanctity of matrimony, the seriousness of the marital contract, and, if applicable, the potential difficulties in interracial marriages is a different matter. Imposition of such a condition for granting of permission to marry is unknown to our legal tradition and repugnant to members of every religious faith, be they Christian, Mohammedan, Buddhist, or other. It smacks of the concept that social workers, pastors, or priests are better qualified to advise individuals of the effect of their own inclination one for the other than those most directly involved. Surely, these are matters which are best left to the choice of the persons who intend to marry, and I believe it is utterly unreasonable to deny them the right to choose whether to submit themselves to such advice. In light of this condition alone, I do not think it unreasonable that this accused chose to forego the procedures so paternalistically offered him by the Navy command in the Philippines.

These, however, as the Chief Judge notes, are merely preliminary considerations. The real issue is whether marriage of naval personnel would have any impact upon the armed service concerned. He believes that such can be found from the possible use of Navy medical facilities by diseased spouses and the consequent endangerment of the health and morale of other personnel. He also points out that many other such examples readily come to mind.

It must be admitted that such an impact upon the services might conceivably result from an accused's marriage with a diseased person or that his marriage *per se* might render him a security risk or otherwise damage the value of his services to the armed forces. These, however, are indirect consequences of his marriage and result from the entitlement of his spouse to such benefits at the hands of the armed forces and from his association with her. They are not the "directly connected" considerations of which we spoke in United States v Martin, supra, and which justify the prohibition of marriage without consent as an activity "reasonably necessary to safeguard and protect the morale, discipline and usefulness of the members of a command." United States v Martin, supra, at page 676. Like statements may be made in connection with our decision in United

States v Wilson, supra. There, the commanding officer expressly stated that he ordered the accused not to drink, as his indulgence in alcohol led him to commit criminal offenses. Surely, that has as direct an impact upon the armed forces as the possibility that its hospital facilities may be strained by attention to wives suffering from infectious diseases. Moreover, in the case of security risks or diseased persons, the Navy has available to it the simple and reasonable remedy of either barring such individuals from its stations or administratively separating the spouse. In short, no real connection has been shown between the requirement that an enlisted man secure the permission of his commanding officer to marry and the lawful scope of the Navy's power to regulate the conduct of its personnel. United States v Milldebrandt, supra; United States v Wilson, supra.

In view of the foregoing, I am unable to agree that this accused violated a *lawful* regulation when he married without the "written consent" of his commander. Accordingly, I record my dissent to the affirmance of the decision of the board of review.