UNITED STATES, Appellee

v

ROBERT ROCCO GIORDANO, Second Lieutenant, U. S. Army

and

JACKIE HARTWELL SIMS, First Lieutenant, U. S. Army, Appellants

15 USCMA 163, 35 CMR 135

No. 17,582

No. 17,584

December 4, 1964

*Captain Richard P. Delaney* and *Captain J. Philip Johnson* argued the cause for Appellants, Accused. With them on the brief were *Colonel Joseph L. Chalk, Lieutenant Colonel Jacob Hagopian, Major George O. Taylor, Jr., Captain Daniel H. Benson,* and *Captain Charles W. Schiesser.*

*Captain Barrie G. Sullivan, II,* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

Tried jointly by a general court-martial convened at Fort Hood, Texas, the two accused officers entered pleas of not guilty. Both were, however, convicted as charged of conspiracy to violate a lawful order, five specifications of violating the same order, and two counts of conduct unbecoming officers and gentlemen, contrary to Articles 81, 92, and 133, Uniform Code of Military Justice, 10 USC §§ 881, 892, and 933, respectively. The court-martial sentenced accused Sims to dismissal and total forfeitures. It fixed accused Giordano's punishment at dismissal. The convening authority approved, and a board of review in the office of The Judge Advocate General of the Army affirmed the findings and sentence as to each accused.

Thereafter, both officers sought review by this Court under the provisions of Article 67(b)(3), Uniform Code of Military Justice, 10 USC § 867. We granted their petitions for review in

order to consider arguments on the following issues:

1. Whether the order involved was legal.

2. Whether the law officer erred in instructing that the accused could be convicted of an offense under specification 2 of Charge III even if they did not know about the order.

3. Whether specification 1 of Charge III is sufficient to allege the offense of conspiracy as conduct unbecoming under Article 133, in the absence of an allegation of an overt act.

4. Whether the law officer was correct in instructing the maximum punishment was dismissal and total forfeitures.

5. Whether the law officer erred in not instructing on multiplicity.

The case at bar has its roots in what may fairly be described as loan shark activity. Generally, the evidence presented by the prosecution showed that three lieutenants—including both the accused officers—of the company commanded by accused Sims, joined in backing a loan operation. It was agreed that one Private First Class Harver, an enlisted member of the same unit, would act as a "front man" for the operation in lending money to other various enlisted personnel. Five men from the same company testified Harver lent them money during April 1963. The loans were for a period of one month, and interest was charged at the rate of fifty percent. Private Harver admitted making loans for a "syndicate." The borrowers did not know where the money came from, but Harver testified it was from a pool, and that his dealings with the commissioned participants in the enterprise were through accused Giordano. A regulation issued by the Commanding General, Fort Hood, Texas, governed loans among military personnel. It specifically prohibited, as usurious and unconscionable, interest rates in excess of three percent per month on loans for a one month period and of the amounts with which we are concerned in the instant case.

Such additional facts as are pertinent to determination of the respective issues will be set forth in the discussion of each.

I

The first issue draws into question the lawfulness of the Fort Hood circular regulating interest rates on loans among military personnel. Appellate defense counsel contend the same is illegal because it invades the accused's private rights without showing of its necessity to protect discipline or its connection with maintenance of good order in the service. Moreover, they assert the order is so broad and uncertain as to be objectionable for that reason. It is claimed "that this is a less than ingenious attempt to sidestep the restrictions placed by this Court in United States v Day, 11 USCMA 549, 29 CMR 365."

*Day* was an Army case in which this Court dismissed specifications alleging usury under the General Article, 10 USC § 934, on the ground there was no such offense in military law in the absence of any statute or regulation fixing a maximum legal rate of interest. We noted in *Day*, however, that the Navy had such a regulation, and suggested that one might be provided by the Army. In the present instance that void is filled by the Fort Hood order.

It is true that military personnel have legal and personal rights not subject to military orders, and that orders which are arbitrary and unreasonable, or too broad and uncertain, cannot be approved. See United States v Milldebrandt, 8 USCMA 635, 25 CMR 139; United States v Wysong, 9 USCMA 249, 26 CMR 29; United States v Nation, 9 USCMA 724, 26 CMR 504; United States v Wilson, 12 USCMA 165, 30 CMR 165; United States v Wheeler, 12 USCMA 387, 30 CMR 387; United States v Aycock, 15 USCMA 158, 35 CMR 130. However, it is also to be remembered, as a unanimous Court pointed out as early as United States v Martin, 1 USCMA 674, 676, 5 CMR 102:

". . . All activities which are reasonably necessary to safeguard

and protect the morale, discipline and usefulness of the members of a command and are directly connected with the maintenance of good order in the services are subject to the control of the officers upon whom the responsibility of the command rests. That the order related to accused's disposition of personal property owned by him does not render it illegal."

Interest rates are commonly regulated in the various civilian jurisdictions, and no extended argument is necessary to demonstrate the obvious impact on morale, discipline, and good order, of loans among military personnel at unconscionable rates of interest in excess of those fixed as proper. Here, we agree with the board of review, which pointed out that:

". . . the order does not prohibit the loaning or borrowing of money but regulates the rate of interest so that, in the interest of morale and discipline, a borrower may maintain his self-respect as a soldier and not become the tool of a harassing money-lender."

The regulation is neither arbitrary nor unreasonable, and we conclude it falls within the scope of the class of orders that may properly be promulgated. By its terms, the regulation clearly applies to the individuals and transactions with which we are concerned and we reject the assertion that it is in anywise vague or uncertain.

We agree with the board of review that the regulation in question is a lawful order, and therefore must rule adversely to the accused on the first issue.

II

Under the second specification of Charge III, the accused were convicted of conduct unbecoming officers and gentlemen by loaning money to enlisted personnel at fifty percent interest per month in violation of the Fort Hood order. The second issue upon which we granted review questions the law officer's instruction that the court-martial might convict the accused of this offense regardless of whether they had knowledge of the order.

In support of their position on this issue, appellate defense counsel again advert to this Court's opinion in United States v Day, supra. Briefly, they argue that "the illegality of usury derives merely from statutory prohibition"; that usury is *malum prohibitum* as opposed to *malum in se*. Because usury's wrongfulness springs from specific prohibition rather than the nature of the act being wrong in itself, the defense argues that the misconduct stems from *knowing* violation of the order regulating loans. Without proof of knowing violation of a valid order, it is asserted, the accused's conduct "is not the type which breaches the minimal standards of a gentleman and officer and subjects an officer to criminal conviction and disgrace."

The nature of the offense of conduct unbecoming an officer and gentleman presently recognized under Article 133, Uniform Code of Military Justice, 10 USC § 933, supra, is discussed in the Manual for Courts-Martial, United States, 1951, paragraph 212, as follows:

"Conduct violative of this article is action or behavior in an official capacity which, in dishonoring or disgracing the individual as an officer, seriously compromises his character as a gentleman, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the individual personally, seriously compromises his standing as an officer.

"There are certain moral attributes common to the ideal officer and the perfect gentleman, a lack of which is indicated by acts of dishonesty or unfair dealing, of indecency or indecorum, or of lawlessness, injustice, or cruelty. Not everyone is or can be expected to meet ideal moral standards, but there is a limit of tolerance below which the individual standards of an officer, cadet, or midshipman cannot fall without seriously compromising his standing as an officer, cadet, or midshipman or his character as a gentleman. This article contemplates conduct by an officer, cadet,

or midshipman which, taking all the circumstances into consideration, is thus compromising.

"This article includes acts made punishable by any other article, provided such acts amount to conduct unbecoming an officer and a gentleman; thus an officer who steals property violates both this and Article 121."

Conduct unbecoming an officer has long been recognized as a military offense, and it is to be noted that the quoted language from the present Manual is substantially identical to the treatment given the same offense[1] by the services under the law prior to the enactment of the Uniform Code. See Manual for Courts-Martial, U. S. Army, 1949, paragraph 182; Manual for Courts-Martial, U. S. Air Force, 1949, paragraph 182; Manual for Courts-Martial of the United States Coast Guard, 1949, article 212; Naval Courts and Boards, 1937, § 99; Manual for Courts-Martial, U. S. Army, 1928, paragraph 151; Manual for Courts-Martial, U. S. Army, 1921, paragraph 445; Manual for Courts-Martial, U. S. Army, 1917, paragraph 445. Indeed, the understanding of the nature of conduct contemplated as being unbecoming an officer and gentleman goes back even further. Thus, Colonel Winthrop, in his treatise Military Law and Precedents, 2d ed, 1920 reprint, noted at pages 711–712:

". . . To constitute therefore the conduct here denounced, the act which forms the basis of the charge must have a double significance and effect. Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents."

From the foregoing, it is evident that

---

1. We recognize, of course, that the present statute no longer prescribes dismissal as mandatory punishment.

the essence of an Article 133 offense is not whether an accused officer's conduct otherwise amounts to an offense— although, of course, it may—but simply whether the acts meet the standard of conduct unbecoming an officer as spelled out. Manifestly this is so for, in the face of a well-defined and long-standing interpretation extant under the precursor statutes—particularly Article of War 95—Congress substantially reenacted the prior law as Article 133 of the Uniform Code, with the single exception of the punishment prescribed. See United States v Davis, 12 USCMA 576, 580, 31 CMR 162; 2 Sutherland, Statutes and Statutory Construction, § 5109 (3d ed, Horack). The same conclusion is also supported by the rationale of our recent decision in United States v Sadinsky, 14 USCMA 563, 34 CMR 343, for, if only conduct otherwise recognized as criminal were embraced by Article 133, the enactment of that statute would be rendered wholly futile and meaningless. See United States v Sadinsky, supra, 14 USCMA at page 566.

Clearly, then, the appropriate standard for assessing criminality under Article 133 is whether the conduct or act charged is dishonorable and compromising as hereinbefore spelled out— this notwithstanding whether or not the act otherwise amounts to a crime. And this is the standard employed by this Court in previous cases where we have had occasion to consider Article 133. See United States v Gomes, 3 USCMA 232, 11 CMR 232; United States v Daggett, 11 USCMA 681, 29 CMR 497.

Against the foregoing backdrop, we turn our attention to the conduct charged against the accused officers, and the law officer's advice that they might be found guilty of the second specification laid under Article 133 regardless of whether they had knowledge of the Fort Hood order. It may be legitimately contended that the instructions of the law officer in this regard were not in error.

The question is whether taking fifty percent monthly interest, on loans by the accused officers to enlisted mem-

bers of their own unit, under their command and supervision, constitutes conduct unbecoming an officer and gentleman. It is not unfair ■ to describe conduct of this sort as wholly incompatible with the necessary attributes of character, honesty, integrity, and fair dealing to be expected of an officer in his relationship with enlisted personnel under his command. Milking personal financial gain of this magnitude from one's own men in such a fashion is bound to have a demoralizing impact, and supplant the respect that is an officer's due with the legitimate resentment of his subordinates. Exorbitant and unconscionable gain by an officer at the expense of an enlisted man is patently unfair, and wholly inconsistent with the officer's duty as to the welfare and interests of those he commands. Selling liquor to enlisted men at excessive prices has been recognized as conduct unbecoming an officer,[2] and the misconduct with which we are concerned in this issue is analogous.

In this connection, we point out that our opinion in United States v Day, supra, adverted to the possibility that exacting unconscionable interest from an enlisted man might constitute conduct unbecoming an officer even in the absence of a provision setting legitimate rates of interest. United States v Day, supra, 11 USCMA at page 550. And in the case at bar, it must be remembered that, apart from whether the accused knew of the Fort Hood order, the Commanding General's directive did prohibit the excessive interest exacted. See United States v Marker, 1 USCMA 393, 398 and 399, 3 CMR 127.

Additionally, we invite attention to Winthrop's discussion of the offense, to which we referred earlier. He observed it has been recognized since the early 1800's, that conduct unbecoming an officer may consist of abuse of authority over soldiers by exacting from them excessive interest. Winthrop's Military Law and Precedents, supra, at page 716. Indeed, by interesting co-

incidence, the examples cited by Colonel Winthrop involved exacting interest of twenty-five percent and one hundred percent per month, exactly braketing the rate charged by the accused officers presently before us.

To paraphrase the language of the present Manual, the accused's conduct, as the court-martial was permitted to find under the questioned instruction, may be said to fall below the limit of tolerance required of commissioned officers. See United States v Sadinsky, supra. And the board of review concluded, in the case at bar, that knowledge of the order was not an essential element of this Article 133 offense.

Beyond spelling out the general principles involved, however, there is no need for us to determine firmly their applicability in the present instance. For another reason, under the facts peculiar to this case, it is clear we must find against the accused on this issue.

It is settled law that incorrect or incomplete instructions do not require reversal where there is no ■ possibility of prejudice to the accused from the omission. United States v Leach, 5 USCMA 466, 18 CMR 90. Cf. United States v Clay, 1 USCMA 74, 1 CMR 74. This Court has held that even where the instructions given to the court-martial on one aspect of an offense are deficient, such error is not prejudicial where, on another offense the findings of the court as to the same matter are returned under correct advice. See United States v Demetris, 9 USCMA 412, 26 CMR 192; United States v Higgins, 4 USCMA 143, 15 CMR 143; United States v Kubel, 1 USCMA 645, 5 CMR 73.

In the case at bar, the accused were both separately convicted on five counts of violating Article 92 of ■ the Code, supra. These specifications involved the same five loans to enlisted men which were involved in the second specification charging conduct unbecoming an officer. With regard to the Article 92 violations, the law officer instructed the court-martial that it could not convict the accused unless convinced beyond a reasonable doubt they had actual knowl-

---

2. United States v Kupfer, 9 CMR 283, affirmed on other grounds 3 USCMA 478, 13 CMR 34.

edge of the Fort Hood order. The court members obviously found such knowledge, for they returned findings of guilty on these five counts. Manifestly, therefore, since the same transactions—same men, money, and dates— and the same order, were involved in those five specifications as in specification 2 of the Article 133 offense, the court-martial could not but have found the knowledge that appellate defense counsel assert is essential to the conduct unbecoming offense. Accordingly, even assuming, for the purpose of argument only, that the law officer's instruction was erroneous, there is absolutely no risk that his advice resulted in prejudice to the accused.

Accordingly, we find no merit in the defense position on the second issue.

### III

Next, we turn our attention to the first specification of Charge III. It purports to allege another Article 133 violation in the following language:

"In that First Lieutenant Jackie Hartwell Sims . . . and Second Lieutenant Robert Rocco Giordano . . . in conjunction with Second Lieutenant James Nelson Embree . . . did, at Fort Hood, Texas, from on or about 1 April 1963 to on or about 21 May 1963, conduct themselves in a manner unbecoming officers and gentlemen by conspiring with Private First Class (E–3) William Harver . . . and among themselves, to commit an offense under Article 92 of the Uniform Code of Military Justice, to wit: failure to obey a lawful order issued by the Commanding General Fort Hood, Texas, to wit: paragraph 2, Regulation 22–11, Headquarters, Fort Hood, Fort Hood, Texas, dated 1 February 1963."

It is to be noted that no overt act in pursuance of the conspiracy is alleged therein and, in the absence thereof, the third issue before us questions the sufficiency of the above averments to allege the offense of conspiracy as conduct unbecoming.

The defense points out that merely conspiring does not constitute a viola-

tion of Article 81 of the Code. Additionally, there must be an ▌ overt act by one of the conspirators tending to effect the object of their agreement. That principle is beyond cavil. As judge Ferguson noted in writing for this Court regarding a conspiracy charge in United States v Hooten, 12 USCMA 339, 342–43, 30 CMR 339:

"... [I]t is clear that the Government was required in the trial to allege and establish the existence, not only of a corrupt agreement . . . but also of an overt act designed to further the ends of the conspiracy. Code, supra, Article 81, 10 USC § 881; Manual, supra, paragraph 160; United States v Mallow, 7 USCMA 116, 21 CMR 242; United States v Choat, 7 USCMA 187, 21 CMR 313."

See also United States v Kauffman, 14 USCMA 283, 292, 34 CMR 63, and United States v Kidd, 13 USCMA 184, 32 CMR 184, and authorities therein collated.

Manifestly, this specification does not allege a violation of Article 81, Uniform Code of Military Justice, supra. However, the Government, in response, notes that we are not here concerned with whether the allegations spell out the crime of conspiracy. Rather, appellate Government counsel argue, the offense charged is that the accused, by their conduct as alleged, wrongfully and dishonorably compromised their standing as officers and gentlemen.

We are confronted here with the sufficiency of the specification to state the offense, as opposed to the instructional problem posed by the preceding issue. Basically, however, both questions resolve themselves to whether the conduct—in the one instance that charged, in the other that permitted to be found under the instructions—constitutes a violation of Article 133 of the Uniform Code, supra. Accordingly, much of our discussion in Part II, hereinbefore, is equally applicable to the third issue.

In light thereof, it is evident that the Government approach has merit. Nonetheless, we cannot agree with the

Government's conclusion, for we are unable to find an Article 133 offense stated by the specification.

We are not here concerned whether a corrupt agreement between officers to violate an order might in the presence of additional circumstances, even absent an overt act in furtherance of the conspiracy, constitute a violation of Article 133. Suffice it to note that here, for aught the averments of the specifications show, there are no such additional circumstances. Neither an overt act nor any further activity of any sort whatever is alleged beyond a bare agreement to violate the order.

As was noted by this Court in the *Martin* case, to which we have previously alluded in Part I:

". . . Mere criminal intention is not punishable as an offense. There must be a criminal act or omission as well as the criminal intent. 22 CJS § 37, page 95. In Sherman v United States, 10 F2d 17, the Circuit Court of Appeals, Sixth Circuit, stated the principle in the following words:

'It is contrary to the general principles of criminal law—except in conspiracy—that the mere intent to violate the law, not followed by actual violation should be a crime . . .'" [United States v Martin, supra, 1 USCMA at pages 676–77.]

Of similar import is the following well-settled principle, quoted from Clark and Marshall, A Treatise on the Law of Crimes, 6th ed, § 4.00, at page 176 and 177:

". . . Criminal intent, unaccompanied by a criminal act, is not punishable. . . .

. . . . .

"Conduct variously categorized as solicitations, attempts and conspiracy (§ 9.00) amount to a sufficiently matured threat of further antisocial conduct that each of the three forms are forbidden and punished despite nonachievement of the ultimate criminal objective toward which such initial behavior patterns were pointed."

Manifestly, bare criminal intent and planning, without more, is not generally recognized as an offense, ██ and we are not persuaded that it is any more to be made the basis for an Article 133 prosecution than any other crime. As we have previously noted, the standard for assessing whether acts amount to conduct unbecoming an officer under Article 133 is not perfection or the ideal. See Manual for Courts-Martial, United States, 1951, supra, paragraph 212; Winthrop's Military Law and Precedents, supra, pages 711–712. While *some* discredit no doubt attaches to any act or omission falling short of the optimum norm, it is settled that not every such incident is of the dishonorable, deceitful, and compromising nature recognized under Article 133 or under Article 134 of the Code. United States v Kirksey, 6 USCMA 556, 21 CMR 272.

Absent any additional averments of circumstances reflecting wherein the accused wrongfully and ██ dishonorably compromised their standing as officers and gentlemen, we conclude that the instant specification—lacking as it does any allegation of an overt act—fails to state an offense in violation of Article 133, Uniform Code of Military Justice, 10 USC § 933. Accordingly, the findings of guilty under the first specification of Charge III must be overturned.

IV

The fourth point upon which we elected to hear arguments concerns the law officer's instruction to the members of the court-martial on sentence. He advised that maximum punishment, for the offenses of which the accused were convicted, was dismissal from the service and forfeiture of all pay and allowances.

The law officer's advice was apparently bottomed on the theory that, insofar as imprisonment was concerned, all of the offenses would be punishable as usury, which carries no confinement. See footnotes four and five, Table of Maximum Punishments, paragraph 127 c, Manual for Courts-Martial, United States, 1951, at pages 219 and 221.

**171**

Appellate defense counsel necessarily follow the approach of the law officer in applying footnote five to all offenses here involved. In doing so, they point out that the punishment listed for usury in the Table includes imposition of forfeitures only; not only is confinement omitted, but punitive separation is not thereby permitted. Thus, in the case of an enlisted accused, the defense contends the instant offenses would not permit punitive discharge.

The defense is not unaware of the provisions of paragraph 127a, Manual for Courts-Martial, United States, 1951. It sets forth maximum limits on sentence, but states, in pertinent part, with regard to officers:

". . . The mentioned limitations, though *not binding upon courts sentencing officers . . . except as stated in 126d and in Section B, 127c,* may be used as a guide, subject to such exceptions as may be deemed warranted for determining the appropriate punishment for such persons." [Emphasis supplied.]

Likewise, appellate defense counsel acknowledge the following provisions of paragraph 126d, Manual for Courts-Martial, United States, 1951, as to punishment of officers:

"*An officer may be punished by dismissal . . . for an offense in violation of an article of the code. . . .* In no case shall a sentence to confinement in the case of an officer or warrant officer exceed the maximum prescribed for enlisted persons by the Table of Maximum Punishments." [Emphasis supplied.]

Thus, the defense argues, the Manual limits imposable confinement equally as to officers and enlisted men, but purports to authorize dismissal upon an officer who offends, regardless of the nature of his crime and notwithstanding that an enlisted man might not be sentenced to discharge. The disparity in permitting dismissal of officers under such circumstances is the gist of the protest lodged here, and in that connection our attention is directed to United States v Smith, 10 USCMA 153, 27 CMR 227; United States v Claypool, 10 USCMA 302, 27 CMR 376; and

**172**

United States v Fretwell, 11 USCMA 377, 29 CMR 193, where this Court indicated concern over rules depending upon whether an accused is an officer or an enlisted man.

The resolution of this issue is not difficult. The short answer is that the punitive Articles under which the accused were convicted all provide punishment "as a court-martial may direct." And Article 56, Uniform Code of Military Justice, 10 USC § 856, authorizes the President to fix maximum limits on the sentence a court may adjudge. Thus, it is evident that Presidential implementations in conformity with such authority have the force of law. United States v Smith, 13 USCMA 105, 32 CMR 105.

The pertinent Manual provisions, hereinbefore quoted, do limit the authorized maximum confinement imposable against officers to that listed in the Table of Maximum Punishments, but no similar provision governs other penalties, and the Manual expressly authorizes dismissal as a permissible sentence in the case of an officer. The formula outlined above is manifestly the one employed by the law officer in the case at bar, and his action conforms to the decision of this Court in United States v Goodwin, 5 USCMA 647, 18 CMR 271, where we were concerned with a similar problem. In that case we specifically adverted to paragraph 126d of the Manual, supra, as authorizing dismissal as a permissible punishment for officers convicted under the Uniform Code, and we expressly rejected the contention that where a punitive discharge could not be imposed against an enlisted offender, dismissal was legally inappropriate for a convicted officer. United States v Goodwin, supra, 5 USCMA at page 649.

Our observations in the cases cited by appellate defense counsel do not militate against our conclusion. In United States v Smith, supra, we were concerned with a wholly different situation, where an instruction might *require,* rather than merely permit, dismissal of an officer. The *Claypool* case,

supra, is likewise inapposite. There we were concerned with standards for assessing criminality under Article 134. We applied the same standards to officers and enlisted men alike, but expressly reserved the possibility that the situation might differ under Article 133. Finally, the *Fretwell* decision cannot be of any aid to the accused. Indeed, quite to the contrary, the question before us in that instance arose only because dismissal *may* be imposed against an officer for *any* offense. The issue upon which the Court divided was whether Lieutenant Fretwell's misconduct constituted a serious or a minor offense. The Court voiced misgivings over holding the offense serious in the case of an officer if it would not be for an enlisted man, merely because dismissal might be adjudged, but all Judges agreed that penalty was imposable.

Accordingly, we conclude the law officer did not err in his instructions on maximum sentence. Paragraph 126*d*, Manual for Courts-Martial, supra; United States v Goodwin, supra.

### V

The final issue requires us to determine whether the law officer erred in not instructing the court-martial on multiplicity. In that regard, he advised the court members as follows:

"The court is advised that as to each accused the maximum punishment for the offenses of which they have been found guilty is to be dismissed from the service and to receive total forfeitures of all pay and allowances."

The law officer did not specifically instruct the court-martial that the offenses were multiplicious.

Even though conspiracy and separate consummated offenses committed in pursuance of the conspir- acy are separately punishable,[3] the Article 133 offense which we approve and the five Article 92 violations would appear to be multiplicious for sentence purposes.

Notwithstanding, we are unable to find error prejudicial to the accused's substantial rights in this regard. In light of our discussion in Part IV, it is clear the law officer did correctly instruct on the maximum sentence which could be adjudged. His only omission was he did not additionally inform the court members that some of the offenses found were not separate for punishment purposes. The question is, therefore, controlled by the prior decisions of this Court in United States v Deshazor, 14 USCMA 667, 34 CMR 447; United States v Searles, 14 USCMA 643, 34 CMR 423; and United States v Green, 9 USCMA 585, 26 CMR 365.

While Judge Ferguson dissented in the first two mentioned cases, he agrees the above authorities are dispositive. Accordingly, we rule adversely to accused on the fifth issue.

### VI

One additional problem remains, and that is the disposition we should order. Even though we have concluded the first specifica- tion of Charge III does not allege an offense, it is nonetheless apparent that the court-martial determined the accused had indeed committed the acts set forth in the invalid charge, for the separate conspiracy count included every item mentioned in the defective Article 133 specification. Moreover, had the averments of that Article 133 count included an overt act, the crime would have been multiplicious with the conspiracy offense with which accused were separately charged. Under those circumstances, it is evident that our ruling in favor of accused, in Part III herein, has no impact whatever on maximum sentence. And since we have determined that the law officer properly instructed the court-martial on imposable punishment, it is manifest that return of this case for reassessment of sentence would be fruitless and would constitute an empty ritual. Punishment has already been imposed based on the identical misconduct which

---

3. See United States v Yarborough, 1 USCMA 678, 5 CMR 106; Pinkerton v United States, 328 US 640, 90 L ed 1489, 66 S Ct 1180.

remains after the invalid Article 133 offense is struck down, and based on the correct standard. See United States v Middleton, 12 USCMA 54, 58, 59, 30 CMR 54; United States v French, 10 USCMA 171, 180, 185, 27 CMR 245.

Accordingly, the accused's convictions under specification 1 of Charge III are set aside and ordered dismissed. In all other respects, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.