UNITED STATES, Appellee,

v.

Woodrow MILLER, Jr., Second Lieutenant, U.S. Army, Appellant.

No. 67,425.

CMR No. 9002880.

U.S. Court of Military Appeals.

Argued Jan. 7, 1993.

Decided June 25, 1993.

For Appellant: *William J. Holmes* (argued); *Ronald L. Jones* (on brief); *Lieutenant Colonel James H. Weise, Captain Thomas D. Wight, Captain Robin L. Hall.*

For Appellee: *Major Donna L. Barlett* (argued); *Colonel Dayton M. Cramer* and *Lieutenant Colonel Joseph A. Russelburg* (on brief); *Lieutenant Colonel Daniel J. Dell'Orto* and *Major Joseph C. Swetnam.*

*Opinion of the Court*

CRAWFORD, Judge:

Contrary to his pleas, appellant was convicted by a general court-martial of conduct unbecoming an officer by failing to report child abuse by his wife and to seek treatment for the abused child (Charge I); being an accessory after the fact to an assault on a child under 16 (Charge II); and willfully disobeying an order not to visit his quarters without an escort (Charge III), in violation of Articles 133, 78, and 90, Uniform Code of Military Justice, 10 USC §§ 933, 878, and 890, respectively. The convening authority approved the adjudged sentence of a dismissal, confinement for 18 months, and total forfeitures. The Court of Military Review in an unpublished opinion dismissed Charge II as multiplicious for findings and Charge III as based on an illegal order, and approved the sentence except for confinement exceeding 6 months. We granted appellant's petition for review on the following issue:

WHETHER THE EVIDENCE PRESENTED ON CHARGE I SUPPORTED THE ADDITIONAL IMPLIED ELEMENT OF CONDUCT SUFFICIENT TO BRING DISGRACE ON THE ARMED FORCES.

## I

Appellant, a distinguished military graduate, entered active duty in October 1989 and started the officer basic course at Fort Knox, Kentucky. While attending the officer basic course, he married Delma Miller who had three children from a previous marriage. Two of those three children, 4–year–old C and 2–year–old K, are involved in the events leading to the conviction of appellant.

Prior to the injuries to K which are at issue in this case, appellant "was aware of [his wife's] prior convictions" for child abuse and knew that the Florida Health and Rehabilitative Services Agency had temporarily taken custody of one child away from his wife for that reason. At the time of appellant's marriage to Delma Miller, Miller's daughter K was in foster care in Florida. Although appellant participated extensively in the hearings to regain custody of the children, he maintained at trial that he had no knowledge that his wife had on three prior occasions abused her children. As this case sadly reveals, the abuse of the children by their mother continued after appellant, his wife, K, and C moved to Fort Hood, Texas.

The facts, as summarized in the Court of Military Review's unpublished opinion, are as follows:

The evidence established that on two separate occasions the appellant's wife had intentionally immersed her two-year-old child in scalding water. The appellant failed to report the abuse and failed to seek adequate medical treatment for his stepdaughter.

Unpub. op. at 1.

Medical testimony indicated that K suffered a third-degree burn to her right foot and second-degree burns to her legs, buttocks, and genital area. These injuries were so extensive that they severely limited her mobility. Despite attempts by appellant to conceal these injuries, they were discovered in May 1990 by Mrs. Bobbi E. Russ, the resident manager of appellant's civilian apartment complex. Mrs. Russ testified that, when she learned from one of the residents that K was alone in appellant's apartment, she proceeded to the apartment and unlocked the door to find K asleep on a blanket on the floor. Mrs. Russ could not locate appellant's work phone number, so she notified the Killeen Police. Mrs. Russ testified as follows:

Q: ... What did you do after you called the police?

A: I went back to the apartment to check to see if the child had awakened yet ... [S]he had her eyes open and so I leaned over to her ... to try to help her up and she couldn't stand up.

Q: Was it obvious to you why she couldn't stand up?

\*  \*  \*

A: Her legs and feet were burned and they were stuck to the blanket. I had to kind of pull the blanket away from the skin and she didn't seem to be able to straighten her legs; they were kind of drawn up.

Mrs. Russ's immediate reaction upon seeing K's extensive injuries was that "this child is really hurt" and needs "medical treatment." The police arrived; an ambulance was called; and Mrs. Russ accompanied K and her sister C to the hospital.

Doctor Thomas A. Soisson, K's treating pediatrician and a burn expert, testified that the pattern and symmetry of K's foot burns indicated that they were caused by being immersed in scalding water. Dr. Soisson verified that K would not walk due to the burns on her feet and the pain associated with such an injury; he also testified that absent such an injury, she was a normally developed child who possessed the motor activity to climb out of a bathtub. Dr. Soisson further testified that he had no doubt that K would be able to climb out of the bathtub if scalding water were turned on. Dr. Soisson stated, "In my opinion, this was non-accidental trauma, which is the term that we use in medicine for child abuse." Dr. Soisson testified that Neosporin, the medicine appellant said he was treating her with, would be helpful. But when K was admitted to the hospital

she possibly did not have Neosporin on her burns. Dr. Soisson testified that even when treating with Neosporin, there was a possibility of infection.

Dr. Soisson testified that in addition to these burns K had also sustained deep second-degree burns on her buttocks. He stated that these burns were potentially life or limb threatening if untreated. Because the burns covered 15% of her body, she was hospitalized for 7 days.

Appellant testified that his wife explained the incidents to him by stating that when K was in the bathtub, C turned on the hot water, scalding K. A social worker testified that the injuries to K were the "classic 'dunking' pattern," that is, a clear demarcation of the water line on K's feet and buttocks. Her injuries were so severe that she would have cried in pain.

Staff Sergeant Donald B. Anson, appellant's neighbor, testified that he and his wife twice baby-sat appellant's children in April 1990 prior to Mrs. Russ' discovery of K's injuries. While baby-sitting in late April, SSG Anson noticed that K could not walk, that appellant would carry K when he dropped her off or picked her up, and that she was dressed in "tennis shoes, socks, pants ... *long pants* ... and [a] shirt" even during hot weather. (Emphasis added.) As well, Sergeant Anson "noticed injuries to [K's] face and also to her feet." Sergeant Anson testified that appellant explained that the doctor had told him to keep socks and shoes over K's injuries.

Ms. Sydney Albritton, a Child Protection Specialist with the Texas Department of Human Services, became involved in this case after being contacted by the hospital staff. Ms. Albritton took pictures of the burn injury to K's buttocks as well as the bathtub where appellant and his wife both claimed these accidents occurred. In her capacity as an expert in the area of detection and recognition of child abuse, Ms. Albritton testified that K's burn injuries were very severe and that she was crying in pain. According to Ms. Albritton, appellant provided the following explanation to her about K's burn injuries on the evening of May 22, 1990:

Q: Well, what did the defendant say as to how ... what his understanding [was] of how these burns were caused?

A: [Appellant] indicated that his wife, Delma Miller, had stated that she had placed [K] in a tub for a bath and that [C] had turned the hot water on the child and that such a scenario had occurred twice; the first time was, according to his recollection, in late February and the last time, he believed, was about two weeks prior to May 22.

\* \* \*

Q: ... [W]hat has been your experience as an investigator in this area, as to that type of explanation?

A. ... [I]n my experience, the explanation is not consistent with the nature of the injuries.

A. Well, is that a commonplace type of explanation, that a sibling was responsible?

A. Yes, that's the one mostly given.

Ms. Albritton also spoke with appellant's wife who confirmed that she told appellant that C turned on the hot water, scalding K on two occasions.

Appellant testified that K was burned for the first time on her buttocks in late February or early March, but he did not seek medical treatment for her because he felt her injuries were "minor" and could be treated at home. He asserted to Ms. Albritton that his wife had told him that C had turned on the hot water. Appellant further testified that K was burned on her buttocks and feet for the second time in late April and that his wife again placed the blame on C. After realizing K had serious burns, appellant testified:

My wife had already had a plan to act on it. She told me that she had called the pharmacist and that he had recommended Neosporin.... My attitude at that time was, "Okay, use the Neosporin, but, if I see that it's not effective and the child is developing infections or the injuries are not healing up, then we're going to take her to the hospital."

Appellant admitted he had purchased the Neosporin but acknowledged that he was aware Neosporin was effective only for *"minor* cuts, scrapes, and burns." (Emphasis added.)

On cross-examination, appellant admitted that use of Neosporin is limited to "minor" injuries and K's injuries were *not* minor, after he had acknowledged on direct that the injuries appeared to be "pretty serious." Appellant further maintained that for the 3 to 5 weeks after she was burned the second time, K could walk and that Mrs. Russ, Ms. Albritton, and Dr. Soisson were lying when they testified that K could not walk because of her injuries. Appellant denied that there was a conversation between himself and Sergeant Anson concerning K's injuries and that he spoke to Sergeant Anson about receiving advice from a doctor. In essence, appellant's position was that Sergeant Anson also testified untruthfully.

Appellant's testimony that C was to blame for both of K's burn injuries was directly contradicted by his own sworn statement, given on May 22, 1990, to the Youth Services Unit, Killeen, Texas, police department. Appellant stated that the cause of the first burns was that "Delma told me that she had ran [sic] water for [K] and the child got in the water or something and got burned ... The next time she got burned ... [s]he said [K] was in the tub and C [the 4-year-old] turned the water on her and caused that burn."

The following colloquy occurred between a court member and appellant:

Q: If one of your soldiers had ... the same type of injuries * * * [i]dentical to your daughter, what would you have done, as his lieutenant?

A: As his lieutenant, sir, I would have referred him ... I would have told him to go to the TMC [troop medical clinic] ...

Q: Why?

A. Well, sir, the fact that ... it would have been better just to have a doctor look at it and see what was what.

* * *

Q: If a civilian had found one of their children in the same identical condition as your daughter and they ran to you for help, because you are a professional Army officer, what would you have advised them to do?

A. I would have advised them to go to the hospital because I wouldn't want to be liable for giving them bad advice....

The evidence further reveals that when appellant was brought to the hospital after K's admission, he showed little emotion and never inquired about her condition.

II

The defense argues that "[t]he sole issue to be resolved" by this Court is whether the Government "presented sufficient evidence at trial to support the implied element necessary to [prove] ... conduct unbecoming an officer in violation of Article 133." Final Brief at 3.

■ The standard to be applied to this issue is whether, after viewing the evidence in the light most favorable to the prosecution, any rational factfinder could have found this element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

■ Article 133 provides: "Any commissioned officer ... who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct." Paragraph 59b, Part IV, Manual for Courts–Martial, United States, 1984, sets forth the elements of conduct unbecoming an officer as follows:

(1) That the accused did or omitted to do certain acts; and

(2) That, under the circumstances, these acts or omissions constituted conduct unbecoming an officer.

It then defines the nature of the offense as follows:

Conduct violative of this article is action or behavior in an official capacity which, in dishonoring or disgracing the person as an officer, seriously compromises the

officer's character as a gentleman, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer. There are certain moral attributes common to the ideal officer and the perfect gentleman, a lack of which is indicated by acts of dishonesty, unfair dealing, indecency, indecorum, lawlessness, injustice, or cruelty. Not everyone is or can be expected to meet unrealistically high moral standards, but there is a limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer, cadet, or midshipman cannot fall without seriously compromising the person's standing as an officer, cadet, or midshipman or the person's character as a gentleman.

Para. 59c(2).

As Article 133 appeared in the Articles of War of 1775, it read as follows: "Whatsoever commissioned officer shall be convicted before a general court-martial of behaving in a scandalous, infamous manner, such as unbecoming the character of an officer and a gentleman, shall be discharged from the service." W. Winthrop, *Military Law and Precedents* 710 (2d ed. 1920 Reprint). Colonel Winthrop indicated that omission of the terms "scandalous" and "infamous" was "to establish a higher standard of character and conduct for officers of the army." *Id.* at 710–11. In *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the Supreme Court held that an officer may be held to a more exacting standard. It "recognized that a military officer holds a particular position of responsibility and command in the Armed Forces." *Id.* at 744, 94 S.Ct. at 2556.

There is not only a moral obligation but a legal obligation recognized by common law that parents and stepparents must prevent abuse to children and seek treatment for sick children. W. LaFave & A. Scott, *Substantive Criminal Law* § 3.3(a)(1) at 284–86 (1986); Annotation, Homicide: failure to provide medical or surgical attention, 100 A.L.R.2d 483, 490 (1965).

In *Regina v. Instan,* [1893] 1 Q.B. 450, 453–54, the court upheld the manslaughter conviction of a niece for failing to provide sufficient care to her aunt. The court found the "cause of death was exhaustion caused by ... gangrene, but substantially accelerated by neglect, want of food, of nursing, and of medical attendance during several days previous to the death." *Id.* at 451. Lord Chief Justice Coleridge recognized that there was "no case directly in point." *Id.* at 454. He found that the defendant had "a moral obligation" towards "the deceased from which arose a legal duty towards her." *Id.* at 454. Violation of this duty resulted in the death of her aunt. He said, "It would not be correct to say that every moral obligation involves a legal duty; but every legal duty is founded on a moral obligation." *Id.* at 453. He continued "that it was the clear duty of the prisoner to impart to the deceased so much as was necessary to sustain life...." *Id.* at 454.

In *Rex v. Russell,* [1933] Vict.L.R. 59 (1932), the defendant was held responsible for the death of his wife and their two children. The defendant saw his wife with the two children in a stroller going down the street. He asked her to come home, but she refused, stating she was going to commit suicide as she had promised for a period of time. Failing to persuade her to come home, he told her to proceed on, and he would come with her. She did so, finding a swimming pool into which she pushed the stroller, drowning the two children. Appellant went after his wife in time to see her and the stroller hit the water. He struggled to rescue the children but was unsuccessful. Judge Mann indicated that the defendant had a "moral duty ... to save his children" and that as a matter of law the conviction could be upheld because of "the acquiescence of the father in the acts of the mother committed in his presence." *Id.* at 75. He indicated that the "connivance" of a parent is different from that of a "mere 'passer-by.'" *Id.* at 76.

In *United States v. Wolf,* 839 F.2d 1387, 1392 (10th Cir.1988), the court found a conspiracy between a sergeant and his wife "involving possible abuse or the possible attempt to cover up abuse and failure to seek adequate medical attention" when determining admissibility of statements against the defendants. *Id.* at 1392. "The inherent dependency of a child upon his parent to obtain medical aid, *i.e.,* the incapacity of a child to evaluate his condition and summon aid by himself, supports imposition of such a duty upon the parent." *Commonwealth v. Konz,* 498 Pa. 639, 450 A.2d 638, 641 (1982).

As the defense asserts, the issue here is whether the Government had presented sufficient evidence to prove the element of conduct unbecoming an officer and a gentleman. The defense argues that the Government "failed to present any evidence regarding the custom of the service in a circumstance such as the one in the instance case." Final Brief at 4. We note that many of the cases cited by the defense supporting this proposition involve fraternization. *United States v. Johanns,* 20 MJ 155 (CMA), *cert. denied,* 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985); *United States v. Parrillo,* 31 MJ 886 (AFCMR 1990), *aff'd,* 34 MJ 112, 120 (CMA 1992).

We disagree with appellant's contention that the Government failed to present any evidence to support the element of conduct unbecoming an officer and a gentleman. To the contrary, direct evidence was presented that appellant's conduct was unbecoming an officer and a gentleman. Appellant knew of serious burns to K, did not seek appropriate medical attention for her injuries, and kept her in the house with her burns covered up during hot weather. In fact, appellant covered up and attempted to conceal the injuries to prevent discovery and further treatment to his stepdaughter. Further, there was direct evidence that appellant's stepdaughter could not walk and had to be carried to the babysitters.

The repugnancy of this type of conduct was demonstrated by Mrs. Russ' reaction upon discovering K alone in the apartment.

When she unlocked the door and saw the condition of K, she immediately thought that "this child is really hurt" and needs medical attention. The seriousness of K's injuries was described by Dr. Soisson, K's treating pediatrician and a burn expert. When Sergeant Anson asked appellant why K could not walk, appellant falsely told him that the doctor had told appellant to keep the socks and shoes over K's injuries. Appellant admitted that if one of his soldiers had the same type of injuries, he would tell that soldier to go to the troop medical clinic.

As this Court said in *United States v. Frazier,* 34 MJ 194, 198 (CMA 1992), "[C]onduct of an officer which ... exhibits a flagrant disrespect for an enlisted man's family severely erodes confidence in command and, thus, unquestionably constitutes conduct unbecoming an officer." Surely an officer's conduct toward his own family should meet no lesser standard. Thus, we hold that "a reasonable military officer would have no doubt that the activities charged in this case constituted conduct unbecoming an officer." *Id.* at 198–99 (footnote omitted).

The decision of the United States Army Court of Military Review is affirmed.

Judges COX and GIERKE concur.

SULLIVAN, Chief Judge (concurring):

To me this case is a much simpler one than Judge Crawford's opinion suggests. The controlling law is this Court's recent decision in *United States v. Frazier,* 34 MJ 194 (CMA 1992), which sets a high standard of duty for officers. In this case, Lieutenant Miller, as an officer of the Army, was required to protect and look after the welfare not only of his troops but also all members of his family. That is one of the essential duties of an officer. Lieutenant Miller failed in discharging his sacred duty according to the evidence presented in this case; therefore, he was properly found guilty as charged.

WISS, Judge (concurring):

In *United States v. Giordano*, 15 USC-MA 163, 167–68, 35 CMR 135, 139–40 (1964), this Court noted that language in paragraph 212, Manual for Courts–Martial, United States, 1951, that discussed what constituted "conduct unbecoming an officer and gentleman," accurately reflected what had been the clear historical view of the law since long before enactment of the Uniform Code of Military Justice in 1950. Paragraph 59c, Part IV, Manual for Courts–Martial, United States, 1984, upon which the majority relies to "define[ ] the nature of the offense" of conduct unbecoming an officer and gentleman, 37 MJ at 136–37, contains language that is identical in pertinent part to that discussed in *Giordano,* so I agree that paragraph 59c, too, accurately reflects the nature of such conduct.

To be encompassed within the proscription of Article 133, UCMJ, 10 USC § 933, the accused's acts must have been both dishonorable, as exposing the officer to disgrace as a person, and compromising, as discrediting the military profession. Here appellant's acts and conduct associated with his seriously injured stepdaughter involved significant incidents of cruelty, neglect, indifference, and deceit. I agree with the majority that there is adequate evidence from which a rational factfinder could have found the requisite elements beyond a reasonable doubt. *Cf. Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Accordingly, I concur.