**UNITED STATES**

v.

**Douglas K. VAN STEENWYK, 482 72 8147, Lieutenant Commander (O–4), U.S. Naval Reserve.**

**NMCM 84 3722.**

U.S. Navy-Marine Corps Court of Military Review.

Sentenced Adjudged 7 April 1985.

Decided 4 Oct. 1985.

CDR David C. Larson, JAGC, USM, Appellate Defense Counsel.

LCDR Jeffrey S. Sawtelle, JAGC, USN, Appellate Government Counsel.

Before COUGHLIN, Senior Judge, and MITCHELL and DeCARLO, JJ.

MITCHELL, Judge:

In April 1984, the appellant was convicted by a general court-martial, with members, of one specification alleging fraternization in violation of Article 133, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 933, two specifications alleging possession of marijuana (Article 134, UCMJ, 10 U.S.C. § 934) and two specifications alleging use of marijuana (Article 134, UCMJ). The essential facts follow. To facilitate the understanding of the circumstances of the offenses of which the appellant was convicted some of the background testimony is also set forth.

HN Synthia Hoback, a corpsman at the Navy Regional Medical Center, Camp Lejeune, North Carolina, testified at trial that she kept a racquetball date with the appellant, an anesthesiologist, at the Navy Regional Medical Center, Camp Lejeune, North Carolina, in December of 1982 and saw the appellant socially many times thereafter in January and February 1983 and during the first three weeks in April of 1983. Several other enlisted persons assigned to the medical center knew of the relationship. The dates may have included, as HN Hoback claimed, sexual intercourse, as well as the appellant's publicly picking up HN Hoback at her barracks in his sports car. The appellant admitted to Naval Investigative Service (NIS) that on two occasions HN Hoback innocently spent the night in his quarters but denied to NIS further activity with her. At the time this relationship began HN Hoback was as-

signed to the surgical ward, but, because she desired to be an operating room technician and since she had a relationship with the appellant, she spoke to the appellant and a Chief Miller about switching to the Anesthesiology Department, to which the appellant was assigned and which he shortly thereafter headed. Thereafter, HN Hoback was transferred into anesthesiology where she soon let her friends know that her only real interest was the appellant. HN Hoback testified that marijuana use and sex were the cornerstones of her relationship with the appellant. The appellant admitted to NIS that he once was aware of marijuana use at an HM3 Vicki Hubbard's housewarming in June of 1983, but denied other knowledge of marijuana abuse. He did not take any steps to deal with the marijuana use at the party, though required to do so in virtue of his office and regulations.[1] In April of 1983, the appellant began dating HM3 Hubbard, the senior corpsman in the Anethesiology Department, headed by the appellant. This switch of affection by the appellant was highlighted by a nosedive in the prior excellent level of performance of HN Hoback which resulted in her receiving unsatisfactory performance ratings in July of 1983. At trial HN Hoback admitted assuming the role of the "jilted woman" and expressing an intention to "burn" the appellant (lastly about the time of the July evaluations to which she formally objected because of perceived unfairness and her claimed previous personal relationship with the appellant), though she did nothing to effect this intention until summoned to Naval Investigative Service (NIS) in September of 1983. She also sought out affection (including sexual intercourse) from another doctor who was married, with family, and, when that relationship fell apart on his release from the Navy, HN Hoback ingested an overdose of drugs (notably an inwardly directed and self-destructive gesture). HN Hoback's complaint about her evaluation resulted in a reconsideration of the evaluation and the submission of an evaluation by LCDR Ed-

1. Article 1139, *U.S. Navy Regulations, 1973.*

mond Pelletier, the senior nurse anesthetist in the appellant's department.[2]

The appellant's relationship with HM3 Hubbard ripened into sexual intercourse in June of 1983 and this intimate relationship continued, at least, into September of 1983. (The appellant and HM3 Hubbard were married after the trial). The relationship was widely known in the Department, though contemporaries and subordinates claimed that the relationship did not affect department operations (a claim obviously subject to some dispute). In addition to sex, HM3 Hubbard and the appellant engaged in marijuana smoking and possession, sometimes in the presence of other enlisted and officer personnel of his and other departments of the hospital.

At the beginning of this relationship, HM3 Hubbard lived with both a girlfriend and HN2 Robert Carswell, an operating room technologist in the Anesthesiology Department. Carswell was also afflicted by the evil weed, such affliction resulting in difficulties with military and civilian authorities. In connection therewith, Carswell agreed to work as an informant. He was familiar with his associates' fraternizing relationship and their attraction to marijuana. Apparently pressed by his agreement with NIS, Carswell reported their activities to NIS and an investigation resulted. HM3 Hubbard, having been asked for names of users by Carswell earlier, ultimately figured out that Carswell had "spilt the beans" and, after talking with the appellant, moved out of her and Carswell's quarters, with appellant's kind and thoughtful assistance.

The appellant also "counselled" HN2 Laurie Reeves, an operating room technician who was having some troubles with her boyfriend. During this counselling period HN2 Reeves met with the appellant at his apartment, where she claims to have helped him with some shelves and did "a couple of other things" with the appellant, which she didn't characterize as dates. On another occasion following a college class, HN2 Reeves and a LCDR Linda Vidrine were on their way to eat when LCDR Vidrine made arrangements for them to eat out with the appellant. All three went to eat together. Neither of these incidents resulted in preferred charges.[3]

This happy life became more complicated when NIS, following up on Carswell's information, called HM3 Hubbard into the office and interrogated her on 13 September 1983. Caught in the stress of the moment and the choice between her own welfare and her love for the appellant, HM3 Hubbard became emotional. She, nonetheless, made a statement in which she admitted her relationship with the appellant and their possession and use of marijuana. Distraught over what she'd done, HM3 Hubbard went to LCDR Pelletier and told him that she had lied to NIS about the marijuana use. Because of her emotional condition, LCDR Pelletier gave HM3 Hubbard time off and then, after learning of the investigation, called the appellant's apartment, where he knew Hubbard would be, and tried to talk to her. The appellant told LCDR Pelletier that HM3 Hubbard was too distraught to talk, so LCDR Pelletier went to the apartment. Meanwhile HM3 Hubbard told the appellant what

---

2. The court-martial acquitted the appellant of fraternization and marijuana abuse offenses related to HN Hoback, whose credibility was vigorously attacked. This Court is bound by that determination. That there was some familiarity between the two and the fact of, and the circumstances surrounding, HN Hoback's downfall are not subject to dispute. Of significance are HN Hoback's arranged transfer to appellant's department and the resultant complications which developed from, as a minimum, HN Hoback's perception of her importance to the appellant.

3. A fair reading of the record gives a sense that personnel in the Anesthesiology Department were quite "chummy" and they, as well as others of various grades, were used to referring to the appellant as "Doug". Marijuana use and condonation of its use was apparently the norm in the Department and among many of those on the periphery thereof. While there is some testimony to the contrary, no true military officer can look at the circumstances of this case and reach any conclusion other than the Anesthesia Department at this medical center bore scant resemblance to a professional medical or military unit.

she'd done at NIS. Then, following a discussion between the appellant, HM3 Hubbard and LCDR Pelletier, the appellant drove to the base legal office on 14 September 1983, to begin efforts to retract her NIS statement. HM3 Hubbard's story now was that NIS had lied to, threatened and coerced her and that she lied about her lover just to get out of threatened trouble, a story she carried through the pretrial investigation and into the trial court. Then on 15 September 1983, HM3 Hubbard had a conversation with the Chief Master at Arms Krysz in which she reaffirmed the accuracy of her NIS statement. At trial HM3 Hubbard said this affirmance was caused by trial counsel threats of perjury prosecution and resultant jail time which frightened her into seeking out Chief Krysz to affirm her NIS statement so that she could get out of the Navy, on her approaching separation date, and, thereby, avoid jail.

Enter LCDR Richard Purdham, an anesthetist in the Anesthesiology Department headed by the appellant and a confidante of the appellant. LCDR Purdham was also interrogated by NIS. Because of some marital discord, LCDR Purdham moved in with the appellant in July of 1983 and was also familiar with the relationship between the appellant and HM3 Hubbard. He also implicated them in a marijuana smoking incident at the appellant's quarters in a 14 September 1983 statement to NIS as well as representing that he, Purdham, had used marijuana and had worked with it in toxicology at Bethesda Naval Hospital and was therefore familiar with it. A couple of days later LCDR Purdham concluded that his statement that the smoking incident involved marijuana was not true and ultimately wrote another statement to NIS "cleaning up" the matter on 19 September 1983. His reason for the switch was that, at the time he gave the statement to NIS, he was greatly fatigued, under personal stress and had a pending medical operation,

so he made this serious allegation against his friend in order to quickly get back to the operating room. Other more credible evidence establishes that he was not so stressed or fatigued that such a serious allegation against a friend would have been unwittingly or lightly made. Nonetheless, by the time of trial the Anesthesiology Department wagons were so circled.

Against this factual backdrop the appellant complains that the allegation of fraternization (Art. 133, UCMJ) is void for vagueness under the due process clause of the Fifth Amendment; that the military judge erred by denying appellant's motion for a panel composed of "Naval" officers; that the evidence bearing on the two marijuana use offenses was insufficient to prove his guilt beyond a reasonable doubt; and that trial counsel engaged in unethical and unfair trial tactics by intentionally eliciting perjured testimony from HM3 Hubbard knowing that the defense was ethically prohibited from adopting the truth of her testimony. We proceed to a consideration of these issues *seriatim*.

## VAGUENESS

The appellant complains that he did not have reasonable notice that intimate relations with an enlisted woman was prohibited conduct under Article 133, UCMJ (hereinafter Article 133), relying chiefly on *United States v. Johanns*, 17 M.J. 862 (A.F.C.M.R.1983) (*Johanns* I) in the brief and on *United States v. Johanns*, 20 M.J. 155 (C.M.A.1985) (*Johanns* II) in oral argument. He does not complain that Article 133 itself is void for vagueness, that matter being conceded as settled by *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Specifically, appellant asserts that, unless there is a demonstrable Navy custom regulation or policy specifically precluding the precise activity in which he engaged, his prosecution is a denial of due process because there is no notice that the conduct is unlawful.[4]

---

**4.** Vagueness has several recognized dimensions. It refers to the persons within the scope of the statute, *see United States v. Cardiff*, 344 U.S. 174,

97 L.Ed. 200, 73 S.Ct. 189 (1952), the acts prohibited by the statute, *Parker v. Levy, supra; State v. Furio*, 267 N.C. 353, 148 S.E.2d 275

■ The UCMJ establishes a disciplinary system for the armed forces. It has as its purpose the securing from its members the prompt obedience to lawful orders and the maintenance of the orderliness and self-discipline necessary to the effective operation and control of an armed force in combat. *Parker v. Levy,* 417 U.S. at 743–748, 94 S.Ct. at 2555–2558, 41 L.Ed.2d at 450–453. The UCMJ is manifestly not a "criminal law" system as that terminology is commonly used, though it, in some respects, has criminal law overtones. *Parker v. Levy,* 417 U.S. at pages 749–752, 94 S.Ct. at 2558–2559, 41 L.Ed.2d at 453–456. *See United States v. Newak,* 15 M.J. 541, 545 (A.F.C.M.R.1982) (Judge Miller concurring).[5]

■ Because of the unique purpose and character of military organizations, the standard for determining the vagueness of a military disciplinary statute is that which is applied to civilian criminal statutes regulating economic affairs, that is, the sufficiency of the notice must be examined in the light of the statute and misconduct with which the defendant is charged, rather than only by examination of the statutory language itself. *Parker v. Levy, supra; Robinson v. United States,* 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945). A statute is not invalid simply because there is difficulty found in determining whether certain marginal actions fall within its language or that within the language of the statute itself there is some flexibility of meaning which permits differing estimates or jury estimates which might differ from those of the accused. A statute is vague if there is no measurable standard at all. *Parker v. Levy, supra. United States v.*

*Harriss,* et al., 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). *See Hygrade Provision Co. v. Sherman,* 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 (1925). *Parker v. Levy* recognizes that in statutes with definite but imprecise standards there is a continuum on which there exists cases where the misconduct patently violates the statute, such as in *Parker v. Levy,* misconduct which violates the statute upon cursory analysis, misconduct which violates the statute upon in depth analysis of the misconduct involved, other misconduct which may remotely violate the statute and misconduct which does not violate the statute. *Parker v. Levy* did not, however, purport to alter the traditional notion of vagueness that, as to an accused, responsibility should not attach where a reasonable man could not reasonably understand that the conduct about to be engaged in is proscribed by the statute. *See United States v. National Dairy Products,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); *United States v. Harriss, supra.* Succinctly stated, the issue, in Article 133 terms, is whether the appellant had sufficient warning that the alleged fraternization was, in the circumstances, disgraceful and status compromising. Certainty can be supplied not only from the text of the statute and the subject dealt with but by well settled common law or technical meaning. *Pacific Coast Dairy v. Police Court of San Francisco,* 214 Cal. 668, 8 P.2d 140 (1932). In the military setting the requisite certainty, and hence notice, can be supplied by custom, usage, practice, regulation and/or policy. *Cf., United States v. Robinson, supra.*

(1966), the acts which are excepted from the prohibition, *State v. Hill,* 189 Kan. 403, 369 P.2d 365 (1962), and uncertainty regarding the penalty. *United States v. Evans,* 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1948). The appellant is not precise as to the dimension in which he lacks notice.

5. Even military courts are prone to misapply the phrase "criminal law" to military discipline. *See United States v. Newak,* 15 M.J. at 545. *See also United States v. Johanns,* 20 M.J. 155, 157 (C.M.A.1985); *United States v. Stocken,* 17 M.J.

826, 829 (A.C.M.R.1984); *United States v. Johanns,* 17 M.J. 862, 868, 869 (A.F.C.M.R.1983); *United States v. Doss,* 15 M.J. 409, 411 (C.M.A. 1983). *See generally,* The Military Justice Act of 1983 Advisory Commission Report, Vol. I, pp. 55 (14 December 1984) (Minority Report). It is not necessary to explore the degree to which the use of the euphemism "criminal law" has skewed the interpretation and application of the UCMJ in given cases. The distinction between criminal law and the law of military discipline is important to an accurate analysis of this case.

█ Article 133 provides that, "Any commissioned officer ... who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct." It is an imprecise statute. Its scope depends upon the alleged misconduct and the circumstances of its commission. The broad reach of this language is, however, limited by custom and usage, not only in the sense of tradition and social custom (as discussed in *Johanns* I and II), but also in the sense that its history and the sorts of specific disciplinary actions taken by military commanders and adjudicated by courts over the years, the guidance provided by the President of the United States, through the Manual for Courts-Martial, and policy and guidance of others in authority have afforded sufficiently specific, though not scientifically precise, understanding of the statute among practical persons in the armed forces to pass constitutional muster. *Parker v. Levy, supra; United States v. National Dairy Products, supra; Swaim v. United States*, 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823 (1897); *Smith v. Whitney*, 116 U.S. 167, 6 S.Ct. 570, 29 L.Ed. 601 (1886); *Dynes v. Hoover*, 20 HOW 65, 15 L.Ed. 838 (1858). *See also United States v. National Dairy Products, supra; United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921). Article 133 does not, therefore, necessarily *require* the existence of a specific custom or regulation governing the *precise* contemplated misconduct in order to have a violation of its terms. *United States v. Giordano*, 16 U.S. C.M.A. 165, 35 C.M.R. 135 (1964). Rather practice, usage and custom guide the determination of what misconduct is reasonably governed by the statute and under what circumstances a contemplated act may violate the statute. *Cf. United States v. National Dairy Products, supra.* It is of no great consequence that the illegality of an act may hinge on the quality of an officer's judgment in guiding his actions. *Parker v. Levy, supra; United States v. Sadinsky*, 14 U.S.C.M.A. 563, 34 C.M.R. 343 (1964); *See Nash v. United States*, 229 U.S. 373, 377, 33 S.Ct. 780, 784, 57 L.Ed. 1232, 1236

(1913). To superimpose a requirement that conduct be prohibited by some specific custom, order, regulation or statute in order to fall within the plain meaning of Article 133 may well satisfy the thirst for specificity expressed by the dissenters in *Parker v. Levy, supra*, and, perhaps, the majority in *Johanns* II, but it would be contrary to the clear and obvious meaning of Article 133 and would effectively emasculate the very essence of the Article. *United States v. Sadinsky, supra*, at page 346; *United States v. Howe*, 17 U.S.C.M.A. 165, 37 C.M.R. 429 (1967); *United States v. Giordano*, 15 U.S.C.M.A. 163, 35 C.M.R. 135 (1964). Thus, it is the alleged misconduct which must be analyzed to determine whether it is disgraceful and compromising as contemplated by the statute. Each case must necessarily be decided on its own merit. *United States v. Pitasi*, 20 U.S.C. M.A. 601, 44 C.M.R. 31 (1971).

█ It is in this light that the appellant's claim that, as to him, Article 133 is unconstitutionally vague must be assessed. The test to be applied to military cases is whether a reasonably prudent Navy officer of the appellant's grade and experience would conclude that the alleged misconduct under the circumstances was unofficer-like within the meaning of Article 133. *United States v. Baker*, No. 84 4043 (N.M.C.M.R. 30 August 1985); *United States v. Jefferson*, 14 M.J. 806 (A.C.M.R.1982), *pet. granted*, 15 M.J. 328 (C.M.A.1983); *United States v. Pitasi*, 20 U.S.C.M.A. 601, 44 CMR 31 (1971); *United States v. Free*, 14 C.M.R. 466 (NBR 1953). Since in resolving this question it is patently proper to consider past disciplinary practices, evidence of any relevant custom or usage, service policies, pertinent regulations, if any, and applicable laws, we are not limited solely to determining whether or not there is extant a custom of the naval service which has been transgressed. *Johanns* II compels no contrary conclusion.

Paragraph 212, *Manual for Courts-Martial, 1969 (Rev.)* (MCM), explains Article 133 and, in large measure, it updates its historical meaning.

Conduct violative of this Article is action or behavior in an official capacity which, in dishonoring or disgracing the individual as an officer, seriously compromises his character as a gentleman, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the individual personally, seriously compromises his standing as an officer. There are certain moral attributes common to the ideal officer and the perfect gentleman, a lack of which is indicated by acts of dishonesty or unfair dealing, of indecency or indecorum, of lawlessness, injustice, or cruelty. Not everyone is or can be expected to meet ideal moral standards, but there is a limit of tolerance below which the individual standards of an officer, cadet, or midshipman cannot fall without seriously compromising his standing as an officer, cadet or midshipman or his character as a gentleman. This article contemplates conduct by a commissioned officer, cadet or midshipman which, taking all of the circumstances into consideration, is thus compromising.

 W. Winthrop, *Military Law and Precedents* (2d Ed.1920), 711, 712 states, in regard to the predecessor of Article 133, the following:

> [T]o constitute therefore the conduct here denounced, the act which forms the basis of the charge must have a double significance and effect. Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents.[6]

Thus, unbecoming conduct patently goes beyond the unsuitable, the inappropriate, the poor taste, the impropitious or the inconsonant with usage. It encompasses the morally unbefitting and unworthy, characteristics with deleterious effects on officer status in particular and good order and discipline in general. Among examples of violations of Article 133 are insulting or defamatory language to another in his presence or about him in a public place, public association with notorious prostitutes, and committing or attempting to commit a crime of moral turpitude. *See Johanns* II, 20 M.J. at 163 (Judge Cox concurring in part/concurring in the result in part).

 Two general classes of offenses arise under Article 133; conduct expressly violative of another article of the UCMJ and, at the same time, by its character, unbecoming an officer and a gentleman, and conduct not elsewhere covered by the UCMJ but, in character, unbecoming an officer and a gentleman. Until the promulgation of *MCM, 1984,* fraternization was not expressly condemned in any article of the Code or in the Table of Maximum Punishments in the M.C.M. Officer and enlisted relationships have, however, been the subject of litigation under both Articles 133 and 134.[7] For example, *United States v. Baker, supra,* [female Marine officer socializing and sleeping with a male gunnery sergeant]; *United States v. Smith,* 18 M.J. 786 (N.M.C.M.R.1984) [Marine Corps officer publically and privately pursued the affections of a female Corporal and a female Lance Corporal]; *United States v. Tedder,* 18 M.J. 777 (N.M.C.M.R.1984), *pet.*

---

**6.** This explanation on the breadth of Article 133 was given the force of law in *United States v. Howe,* 17 U.S.C.M.A. 165, 177–178, 37 C.M.R. 429, 441–442 (1967) and recognized in *Parker v. Levy,* 417 U.S. at 753–754, 94 S.Ct. at 2562, 41 L.Ed.2d at 456. The *Howe* Court also recognized that an officer on active duty is not a civilian and his off-duty activities do not escape the application of Article 133. *United States v. Howe,* 37 C.M.R. at 442.

**7.** Article 134, UCMJ. Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special or summary court-martial, according to the degree of the offense, and shall be punished at the discretion of that Court.

*granted,* 19 M.J. 115 (C.M.A.1984) [recognizing vitality of Naval Service custom against fraternization, but holding that a brief conversation between Marine officers and female enlisted personnel at a bar did not violate Article 134, UCMJ]; *United States v. Jefferson,* 14 M.J. 806 (A.C.M.R. 1982), *pet. granted,* 15 M.J. 328 (C.M.A. 1983) [married Army officer having sexual intercourse with enlisted woman]; *United States v. Pitasi,* 20 U.S.C.M.A. 601, 44 C.M.R. 31 (1971) [Navy officer engaged in sodomy with enlisted man]; *United States v. Lovejoy,* 20 U.S.C.M.A. 18, 42 C.M.R. 210 (1970) [Navy officer engaged in sodomy with enlisted man. Court recognized the essence of this Article 134 offense was the intimacy of the relationship]; *United States v. Giordano,* 15 U.S.C.M.A. 163, 35 C.M.R. 135 (1964) [Army officer loaning money at usurious interest rates to enlisted members]; *United States v. Battista,* 14 U.S.C.M.A. 70, 33 C.M.R. 282 (1963); and *United States v. Holland,* 12 U.S.C.M.A. 444, 31 C.M.R. 30 (1961) [Navy officers indecently inducing enlisted men to disrobe and pose in the nude]; *United States v. Free,* 14 C.M.R. 466 (NBR 1953) [Marine officer billeted enlisted man in officer's quarters, offering alcoholic beverages and an invitation to sleep there]; *United States v. Jackson,* 12 C.M.R. 403 (ABR 1953), *pet. denied,* 13 C.M.R. 142 (1953) [Army officer used obscene and degrading language construable as a homosexual advance, toward enlisted man]; *United States v. Rice,* 14 C.M.R. 316 (ABR 1954), *pet. denied,* 15 C.M.R. 431 (1954) [Army officer entering bordello with enlisted man]; *United States v. Livingston,* 8 C.M.R. 206 (ABR 1952), *pet. denied,* 2 U.S.C.M.A. 676, 8 C.M.R. 178 (1953) [Army officer offering intoxicating liquor to, drinking with and actively pursuing a personal and familiar relationship with an enlisted man]; and *United States v. Lee,* 4 C.M.R. 185 (ABR 1952), *pet. denied,* 1 U.S.C.M.A. 712, 4 C.M.R. 173 (1952) [Army officer found semi-clad in the bed of enlisted man's wife].

This list of more recent cases, though not exhaustive, vividly indicates that relationships, especially sexual relationships, between officers and enlisted persons is not as free-wheeling in the armed forces as is the case in civilian society and plainly indicates that the various armed forces set limits on the relationship of officers to enlisted personnel. In these cases, the existence of the naval custom governing this relationship is, without serious question, judicially recognized and we so hold. These cases, moreover, patently warn officers to approach relations with enlisted persons with cautious judgment. Other articles of the UCMJ related to the superior-subordinate relationship (Articles 89, 90, 91, 10 U.S.C. §§ 889, 890, 891, etc.) reinforce this relatively distinct relationship, as does the physical evidence of separate messes, separate quarters, separate social clubs, etc., readily perceived at any naval installation. Even in those remote locales where there are all ranks clubs, there is almost always a separation of officer and enlisted areas. Enlisted personnel are not so restrained either in their relationships to officers or to other enlisted personnel. *United States v. Stocken,* 17 M.J. 826 (A.C.M.R.1984) [no fraternization concept between enlisted personnel in the Army].

The customary higher standard of conduct for officers stems from the time of William the Conqueror, when chivalry incorporated social as well as military conduct. *See,* Snedecker, *Military Justice Under the Uniform Code* § 87 (Little Brown and Co., 1953). At first, the Code of Chivalry was unwritten but the higher standard eventually appeared in British Naval law in 1596, when articles governing the British fleet prohibited defamation of the character of any officer or gentleman in the fleet. *The British Articles of War, 1765,* sec. XV, Art. 23, reprinted in Winthrop, *Military Law and Precedents* at 945, subjected to court-martial officers who behaved in a scandalous infamous manner, such as was unbecoming of an officer and a gentleman. Eventually the essentials of this language appeared in the UCMJ as Article 133. The significant change was that the Article was broadened to cover

minor offenses. 95 Cong.Rec. 5843 (1949). The Article, as originally drafted, was designed for serious offenses which exhibited an officer as morally unworthy to remain an officer. *Manual for Courts-Martial, United States Army, 1949,* paragraph 182. While historically the officer-gentleman standard may have been related more to social than military necessity, its underlying purpose has always been the maintenance of the honor, integrity and objectivity requisite to the fostering among enlisted members of a confidence and respect for the authority of the officer corps. *United States v. Free, supra,* 14 C.M.R. at 469–471. Thus acts which disgrace the officer before his subordinates, or the use of the officer's position to take advantage of subordinates, remains covered by Article 133. Thus, where the circumstances of an act of fraternization involve the requisite disgrace and compromise, the Article is violated. Such disgrace and compromise need not actually be perceived by subordinates whose degree of military socialization and experience is likely to be very limited. It is enough that a reasonably prudent person experienced in the problems of military leadership could conclude that the requisite disgrace and compromise existed in the circumstances. *See Parker v. Levy, supra; United States v. Pitasi, supra; United States v. Jefferson, supra; United States v. Free, supra.*

The case most often cited and commended on the matter of officer-enlisted relationships is *United States v. Free, supra.* While *Free* was an Article 134 case it contains such powerful language regarding fraternization that it was quoted extensively and approvingly by the Court of Military Appeals in *United States v. Pitasi, supra.*

The problem presented to us is to draw a line as to where acts of fraternization or association with enlisted men by officers cease to be the innocent acts of comradeship and normal social intercourse between members of a democratic military force and become a violation of Article 134 of the Code, prejudicial to good order and discipline in the armed forces of the United States.

\* \* \* \* \* \*

The military services demand a regard for authority by juniors towards their seniors which experience has shown is enhanced by the observance of decorum, tradition, custom, usage, and conventions which are peculiar to the services alone. The regard and respect for authority upon which rests the unquestioned obedience of the serviceman which is mandatory in time of battle or stress is lessened by the failure to observe niceties of military courtesy and other traditions and customs.

Because of the many situations which might arise, it would be a practical impossibility to lay down a measuring rod of particularities to determine in advance what acts are prejudicial to good order and discipline and what are not. *As we have said, the surrounding circumstances have more to do with making the act prejudicial than the act itself in many cases.* Suffice it to say, then, that each case must be determined on its own merits. Where it is shown that the acts and circumstances are such as to lead a reasonably prudent person, experienced in the problems of military leadership, to conclude that the good order and discipline of the armed forces has been prejudiced by the compromising of an enlisted person's respect for the integrity and gentlemanly obligations of an officer, there has been an offense under Article 134.

\* \* \* \* \* \*

There is no risk attached when an officer offers to do simple courtesies to strangers, enlisted or civilian, such as providing transportation in an automobile, eating and drinking together under dignified conditions, and even sharing sleeping accommodations if it is shown that the persons concerned are closely related, or that their civilian social relationship is such as to make the act socially acceptable. It is not at all difficult for the reasonably prudent officer to dis-

criminate between what circumstances justify a particular act and what render the act so curtailing of the dignity required by an officer's obligations as to make it an offense against good order and discipline. True, discrimination must be exercised, but the nature of an officer's commission demonstrates that he has been selected from among the populace as a whole to hold a position of trust and honor and has been trained to exercise the nice discrimination required. It is likewise true that a degree of judgment is required of an officer which is not required of the enlisted member of the service or of a civilian. It follows that a different standard of conduct is required in law of an officer than is required of others. This, in effect, puts him in a different legal status than the enlisted man or the civilian. While it may be difficult for the lay mind or even the lawyer whose only experience has been with civilian codes to conceive of such a burden being imposed on one member of the community and not all, nevertheless, the nature of the military service is such that there are many acts which are offenses under military law which do not and could not apply to the civilian community. For instance, there are the military offenses of desertion and sleeping on watch which have no counterpart in the civilian's code of laws.

We refuse to subscribe to the proposition that the Code of Military Justice operates to lower the standards of honor and conduct in the military service to that of a civilian criminal code. 14 C.M.R. at 468–471.

The language in *Free* describes the purpose and parameters and importance to the Naval Service of appropriate relationships between officers and enlisted personnel. This language regarding Article 134, both in meaning and recognition of the customary relationship between officers and enlisted persons, applies no less to Article 133.

In the face of such principles contained in the cases and precedents it is illogical to argue that the disgrace and compromise inherent in the elements of Article 133 cannot be found in officer-enlisted relationships or that a reasonably prudent officer is not on notice to approach such relationships with cautious judgment. Admittedly socializing with enlisted personnel, standing alone, has been held in an Army case not to disgrace the individual. *United States v. Patterson*, 41 B.R. 365, C.M. 264077 (1944). But under other circumstances and particularly where sexual conduct was involved, the Article 133 standards of disgrace and compromise have been found. *United States v. Smith, supra; United States v. Tedder, supra; United States v. Brauchler*, 15 M.J. 755 (A.F.C.M.R.1983); *United States v. Jefferson, supra; United States v. Parini*, 12 M.J. 679 (A.C.M.R.1981) *pet. denied*, 13 M.J. 210 (C.M.A.1982); *United States v. Pitasi, supra; United States v. Battista, supra; United States v. Holland, supra; United States v. Lee, supra.*[8]

---

8. The Air Force Court of Military Review in *Johanns* I seemed to see a limit to the reach of the foregoing cases in the common threads of aberrant sexual misconduct or the seeking sexual favors from subordinates because those cases contain no discussion of private consensual sexual activity. *Johanns* I, 17 M.J. at 867. No such limitation can legitimately be read into those cases. Each case was decided on its own merit in accordance with its facts and the elements of proof of the statute involved. There was no particular need in those cases to resolve hypothetical situations. The character of officer-enlisted relationships, not similarity to statutory or historically recognized offenses, was clearly the underpinning of the rationale of all of those cases. *United States v. Pitasi, supra*, for example, contains extensive general discussion of fraternization, quoting extensively from *United States v. Free, supra. Free* can hardly be construed to be limited to aberrant sexual misconduct. For purposes of resolving the case at bar there is no need to consider any but the circumstances pertinent to this case, though it may well be that a private consensual act of intercourse between an officer and an enlisted person may occur under circumstances which do not disgrace and compromise as those terms are used in Article 133. Thus, conduct not having the requisite Article 133 character may still amount to a violation of Article 134 or it may be innocent conduct. However, the conduct is ultimately characterized, it is circumstance depend-

Other warnings regarding officer-enlisted relationships are also extant in the Naval Service. The *Marine Corps Manual,* which is issued in accordance with *U.S. Navy Regulations, 1973,* for the instruction and guidance of all persons in the Department of the Navy in matters concerning the Marine Corps (the appellant was serving at a Marine Corps installation at the time of the alleged offenses and thus, possessed of a prudent obligation to be at least generally familiar with the basic guidance of the service with which he was serving), provides in paragraph 1100.4:

> Relations Between Officers and Enlisted Marines. Duty relationships and social and business contacts among Marines of different grades will be consistent with traditional standards of good order and discipline and mutual respect that has always existed between Marines of senior grade and those of lower grades. Situations that unite or give the appearance of familiarity or undue informality among Marines of different grades will be avoided or, if found to exist, corrected.

This standard was given approval by this Court in 1953, *United States v. Free, supra. See also United States v. Smith, supra; United States v. Baker, supra; United States v. Tedder, supra.* The Navy is not without pertinent guidance in its branch of the Naval establishment.[9] The widely disseminated *Useful Information for Newly Commissioned Officers,* 1985 Edition, Naval Education and Training Command publication 10802–AG, a reference guide to facilitate the understanding of the new life and the social adjustment of new officers to the Navy, includes pertinent guidance under the section entitled CUSTOMS OF THE SERVICE: RELATIONS BETWEEN OFFICERS AND ENLISTED PERSONNEL, from which is paraphrased the following:

> The relations between an officer and crew [enlisted men] should be founded on mutual respect. An American bluejacket ... wants to be treated as an adult whose abilities are appreciated [and] wants to respect the officers of the command—to admire them and to be able to boast about them to those aboard other ships.... By virtue of their commissions [new officers] are placed in charge of enlisted personnel. The authority is strange, there is a desire to be liked by their personnel, to know them and, yet, maintain rightful authority over them.
>
> Personal dignity is a quality which must be developed. Possessed by successful leaders, it enables the officer to converse at length with their personnel on casual and unofficial matters, and yet maintain that reserve which discourages undue familiarity.
>
> Consideration for enlisted personnel is a "must." A good leader always considers the welfare of enlisted personnel. Some new officers feel that they promote friendliness between themselves and their personnel by calling them by their first name, or, worse yet, by their nicknames. Always address personnel by title and last name.
>
> *Never* permit enlisted personnel to visit in your room or in the wardroom unless the matter is extremely urgent. Financial transactions between officers and enlisted personnel are forbidden, except for sale of personal items [under limited circumstances].
>
> In summary, relations between officer and enlisted personnel are founded upon the same mutual respect as those between fellow officers. The measure of

---

ent for its characterization. *United States v. Free, supra.*

**9.** Article 1131, *U.S. Navy Regulations, 1973,* prohibits pecuniary dealings between officer and enlisted personnel. This regulation, which reflects custom, makes an interesting comparison with appellant's argument that he had no notice that the infinitely more personal sexual relationships between officers and enlisted personnel might be unlawful. *See also* paragraph 5, SECNAVINST 5370.2g of 4 August 1977 (Standards of Conduct) re policies against using office for personal gain, giving preferential treatment, losing independence and impartiality, and adversely affecting confidence in the integrity of the Government.

respect that you inspire in your enlisted personnel is your measure of success as an officer, that is, your sincerity; your sense of justice; your interest and concern for your crew's welfare; your dignity and bearing; your firmness and consistency in requiring obedience to your orders and those of the captain, and your interest in and knowledge of your profession.

The foregoing language appears in editions of this publication disseminated at least as long ago as 1974 [Naval Education and Training Command includes Officer Indoctrination School and Officer Candidate School as well as other training commands.] While there exist differences in format purpose and language between the Marine Corps standard and the Navy standard of officer-enlisted relationships, the standards are, for all practical purposes, the same, as would be expected in view of the historical origins of the two branches as a sea service team and notwithstanding the presence of formidable air forces in both branches.

Common sense and a reading of the foregoing extant administrative guidance and case law leads inescapably to the conclusion that circumspect relationships between officers and enlisted personnel are not required to maintain a social caste system but to maintain respect for authority and to avoid having decisions, which may well involve important matters (including the risk of life and the welfare of the command and the nation) compromised, or perceived to be compromised, by inappropriate personal relationships. Respect for authority is a cornerstone of discipline, intangible though it may be.[10]

We hold that where there is extant such a wealth of tradition and usage, case law,

10. Perhaps, this reality is why *Parker v. Levy,* 417 U.S. at 749, 94 S.Ct. at 2558 quotes approvingly from *Swaim v. United States,* 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823 (1897):

Of questions not depending upon the construction of statutes, but upon the unwritten military law or usage, within the jurisdiction of courts-martial, military or naval officers, from their training and experience in the service, are more competent judges than the courts of common law. 165 U.S. at 562, 17 S.Ct. at 451, 41 L.Ed. at 826.

In *Johanns* II, the Court of Military Appeals, in dicta, suggests that the advent of large numbers of women in the armed forces may, in its view, undermine the traditional relationships between officers and enlisted personnel. In reality, however, the traditional relationship between officers and enlisted personnel never depended upon sex for its vitality. The concept of fraternization was born in a male Navy. The advent of large numbers of women in the Navy merely creates another basis and more frequent opportunity for fraternization. Relationships in which sexual relations are involved are emotional and often quite volatile regardless of whether officer, enlisted or a mixture of personnel are involved. Such relationships involve illogical actions and thinking, envy, jealousy and perceptions of favoritism and advantage which are only magnified when one of the persons involved in the relationship is an officer. The advent of large numbers of women in the Navy only underscores the need to appropriately circumscribe officer-enlisted relationships.

The suggestion in *Johanns* II that times have changed, implying that the officer corps may not as readily follow the custom of fraternization in view of the attitudes extant in the civilian society, however true it may be of circumstances in the Air Force, does not force the conclusion that in the Naval Service the fraternization custom should be struck down. There is grave danger in permitting the younger, and presumably least militarily experienced and socialized, officers to dictate the appropriateness of critical relationships upon which the discipline of an armed force, whose officers must largely lead, guide and direct and whose enlisted personnel must fight, is hinged. The seemingly innocuous fraternization issue actually impacts directly on primordial forces with which the courts ought not to trifle. Assuming, *arguendo,* the full truth of HN Hoback's version of the facts surrounding her relationship with the appellant, one can readily see the complications which can arise in an armed force from a seemingly innocuous personal relationship. The addition of the ingredient of personal danger, such as exists in hostile fire or combat zones, promise only an exacerbation of the problem. One can only imagine how the appellant could effectively and without serious morale problems decide which one of his subordinate females would have to risk life and limb to cover an assignment given to his unit to undertake. Even in peacetime, today's lovers from different commands are tomorrow's superior and subordinate in the same command. These things comprise the wisdom of the well-recognized naval tradition regarding fraternization and of the concurrent opinion in *Johanns* II, 20 M.J. at 164, 165 (Judge Cox concurring/concurring in the result).

and administrative guidance defining with reasonable specificity the parameters of officer enlisted relationships, that a prudent Navy officer of reasonable intelligence is on notice to exercise prudent judgment in a contemplated officer-enlisted relationship and that bad judgment in which the elements of Article 133 and/or Article 134 are present exposes the officer to disciplinary action under the appropriate Article.

The appellant is a highly intelligent lieutenant commander in the Navy, and thus presumably competent to be, both technically as a physician and professionally as a Navy officer. He entered the Navy voluntarily and thereby undertook some responsibility to learn of the society he entered. As stated in oral argument, he went through Officer Indoctrination School, a subordinate unit of Naval Education and Training Command, had three years active service at a Marine installation and in Lebanon, where he had to be exposed to examples of other officers in handling enlisted personnel, and he was given responsibility as head of a medical center department, an assignment which we presume he was judged competent to discharge. The appellant was not a fledgling, but an officer of some experience possessed of no unusual factors which might persuade this Court to more flexibly apply the standard of fair notice.

It is of no great moment that some others in the Navy and at the medical center at Camp Lejeune may not have adhered to or believed in the principle of non-fraternization [11] for much of the same situation attends even civilian criminal statutes. Appellant also disclaims argument for a "stovepipe" standard of officer-enlisted relationship in the medical community to the exclusion of the standard applicable to the Naval Service as a whole.

■ Based on the whole of the factors bearing on this issue, we conclude that the appellant had reasonable notice that his relationships with enlisted personnel were required to be circumspect and that the exercise of bad judgment in the matter could lead to disciplinary action.

■ The fraternization [12] specification of which the appellant was convicted was worded as follows:

In that ... did at ... during the period of June 1983 to September 1983, wrongfully fraternize with then HM3 Vicki L. Hubbard, U.S. Navy, a member of the same department as he was, on terms of military equality, by sleeping in the same bed with her, having sexual intercourse with her and socializing with her in other ways as an equal ... such conduct was unbecoming of an officer and a gentleman.

■ The principle of due process is not completely satisfied by reasonable notice that officer-enlisted relationships must be circumspect, for the appellant must have reasonable notice that his conduct under the circumstances may be unofficer like and ungentlemanly. All of the facts which bear on this quality need not be pleaded or may be imprecisely pleaded, so resort to the surrounding circumstances is appropriate to determine the adequacy of notice. The object of appellant's affection was the leading petty officer of his department. The relationship between them not only

---

**11.** Some witnesses subordinate to the appellant were aware that fraternization was not proper, while other witnesses saw nothing wrong with fraternization. Witnesses testified that the appellant and HM3 Hubbard did not display their mutual affection at the office, a circumstance suggesting that the appellant, as well as HM3 Hubbard, was at least aware that his relationship with Hubbard carried a certain risk to himself.

**12.** Fraternization as defined in plain civilian usage means associating in a brotherly manner; being on friendly terms. The military usage of the term is very similar except that, absent a regulation containing a different definition, fraternization refers to a military superior-subordinate relationship in which mutual respect of grade is ignored. *See United States v. Stocken, supra.* As previously noted, it is not the label used but the character of this misconduct which is determinative of criminality. We need not decide in this case whether in the Naval Service wrongful fraternization can occur within the enlisted grades. *See United States v. Stocken, supra.*

involved sex, dating and frequent visits in quarters but extended also to mutual marijuana smoking in the presence of others of various grades. Subordinate enlisted personnel and contemporary officers were exposed to this relationship in varying degrees. While the marijuana smoking was the subject of other charged offenses and the appellant used the substance in the company of others of various enlisted and officer grades, his intimate relationship with HM3 Hubbard obviously facilitated his miserable standard of leadership and virtually deprived him of the capacity to take corrective action against Hubbard or anyone else with whom he associated in this activity. It is unnecessary to determine the prime motivation for his conduct. He set himself up as a big fish and Carswell skinned him when it served Carswell's interest. Even HM3 Hubbard sought to save her skin by implicating the appellant. Furthermore, the relationship with Hubbard was a factor in the drop in performance quality of HN Hoback and resulted in her "jilted woman" challenge to her performance markings. It is not without significance that this relationship also resulted in the demise of the honor of HM3 Hubbard and of LCDR Purdham (and, perhaps others) as they sought to change their statements to NIS with contrived explanations and as they testified less than candidly at trial. The standard of conduct the appellant set in these circumstances can only be described as disgraceful.

■ The appellant gains no advantage from the fact that the Navy has issued OPNAVINST 11101.13H of 7 August 1984 (governing *inter alia* assignment to mar-ried family housing), which recognizes the inappropriateness of mixed grade marriages but authorizes assignment of mixed couples to officer quarters.[13] Regulations must deal with both actualities and the realities of potential but not necessarily existing or approved situations. The actuality or potential with which the regulation deals relates to housing of mixed grade marriages, regardless of their inappropriateness, where a member is entitled to assignment to vacant quarters and the spouse is still in the Navy or the officer reservist who, being married in civilian life to an enlisted reservist, is called to active duty. The reality of having to deal with such housing situations cannot be construed either as a condonation of mixed marriages or of fraternization. Nor is there solace in *Johanns* II, *supra*. First, *Johanns* II involved fact-finding at the Air Force Court of Military Review which the Court of Military Appeals felt bound to follow. Second, the conclusion that the Air Force had so socially mixed grades that due process notice was lacking is not new. In *United States v. Stocken, supra*, the Army Court of Military Review citing the traditional social mixing among members of the enlisted grade structure in the Army and the traditional disapprobation of only officer-enlisted fraternization reversed the fraternization conviction of a staff sergeant who socialized and had consensual sexual intercourse with at least one female private. The holding in *Stocken* is not *contra* to that in *United States v. Hoard*, 12 M.J. 563 (A.C.M.R.1981), where the basis of prosecution was a specific *regulation*

---

13. Paragraph 1.c., Enclosure (2), OPNAVINST 11101.13H, provides as follows:

c. When both husband and wife are members of the uniformed services with no other dependents and are stationed or homeported (assigned to ship) at the same or adjacent military installations, the following provisions apply:

(1) *Both Officer or Both Enlisted:* Either member may be assigned to MFH. See reference (b) concerning BAQ entitlements.

(2) *Enlisted—Officer:* Assignment to MFH under these circumstances has traditionally not been considered in the best interest of the ser-vice. However, they may be assigned to MFH. See reference (b) concerning BAQ entitlements. Enlisted members already occupying MFH, who become officers, are eligible for officer category housing as discussed in enclosure (3), paragraph 2b. *Officers will not be assigned to enlisted housing.*

d. When both parties concerned are members of the uniformed services, with no other dependents and when such parties are precluded by distance from living together, both parties will normally be treated as members without dependents and are not eligible for assignment to MFH.

limiting permanent personnel-trainee relationships at a training command. The Air Force Court of Military Review, rightly or wrongly, determined that social mixing of grades had occurred *institutionally* to such an extent in the Air Force that the situation more succinctly addressed in the *Stocken* case existed. In such circumstance, notice of the wrongfulness of mere consensual sexual intercourse with enlisted personnel was, understandably, deemed lacking. The Naval Service has manifestly neither abandoned its custom against fraternization, nor has it condoned fraternization nor has it institutionally mixed socially the officer and enlisted grades to such an extent that the resultant egalitarianism, seen in *Johanns* and *Stocken* raises due process problems. *United States v. Baker, supra; United States v. Smith, supra; United States v. Tedder, supra.* The call for regulatory specificity to avoid notice problems, manifested by dicta in the majority opinion of *Johanns* II, because of the differing circumstances between *Johanns* and the instant case, is not controlling in this case.[14]

Considering the circumstances surrounding the alleged misconduct in this case we cannot conceive that the appellant did not have reasonable notice that his relationship with HM3 Hubbard was fraternization, that under the circumstances the relationship was personally and professionally disgraceful and that the relationship seriously compromised his standing as an officer and gentleman. The misconduct under Article 133 in the circumstances of this case is nearly as patently so as that involved in *Parker v. Levy, supra.* We hold that the appellant was not deprived of due process of law. In so holding, it is not necessary to decide at what distance from patently unofficer-like conduct the Navy bears the burden of buttressing a claim of illegality with clearer written notice or proof of the existence of a specific custom or usage that certain conduct is considered unofficer-like. We decide only that notice is apparent in this case.

## NAVAL OFFICER COURT-MARTIAL

The appellant's use of the term "Naval" to apply solely to Navy officers is inappropriate. The Navy and Marine Corps comprise the Naval Establishment, Article 1, UCMJ, 10 U.S.C. § 801. The appellant's claim of military judge error in denying appellant's motion for a panel composed solely of *Navy* officers is premised solely on the fact that the court-martial as originally composed had only one Navy officer and eight Marine Corps officers assigned. No statistical information regarding the proportion of Navy officers to Marine Corps officers, assigned to Marine Corps Base, Camp Lejeune, North Carolina is proffered nor is there any information regarding the extent to which the convening authority had the power or other capability to appoint others. The thrust of appellant's complaint is not that the convening authority utilized inappropriate legal standards in selecting members but, that the Marine Corps standard regarding fraternization was more strict, the convening authority deliberately selected a court-martial which was, thus, springloaded to unfairly judge the appellant and the result presented an image of unfairness and inflexibility, citing *United States v. Negron*, 19 M.J. 629 (N.M.C.M.R.1984).

■ The premise of the argument, regarding the relatively more severe fraternization standard of the Marine Corps, is rejected. As previously noted, there is no meaningful distinction between the Navy and Marine Corps regarding fraternization nor is there any evidence that the convening authority used improper criteria in se-

---

**14.** It may, in fact, not be possible, given the infinite variables of the matter, to write a usable yet understandable comprehensive regulation governing fraternization and improve on Article 133 and 134 specificity standards one whit. The fraternization problem may be best left to those standards on a case-by-case basis and military or naval officers whose training and experience in the service make them more competent judges of the matter than those who are less trained and experienced. *Swain v. United States, supra,* 165 U.S. at 562, 17 S.Ct. at 451, 41 L.Ed. at 826.

lecting court members. The gratuitous suggestion in *Negron* that Marine commanders assign Navy officers to cases with Navy defendants is not necessarily logically or factually sound, nor does it have any support in law. Furthermore, the suggestion ignores the reality that the Marine Corps is, in fact, a sea service. Moreover, appellant deftly changes the character of his trial motion on appeal. At trial he moved for a panel composed exclusively of Navy officers. Now he complains that the court-martial panel does not represent a cross section of the military community from which drawn, Marine Corps Base, Camp Lejeune, patently a Marine command.

 Whatever may be the standard of jury selection in the civilian community, the nature of the armed forces and its need for discipline have resulted in different considerations being applied to court-martial member selection. Article 25(d)(2), UCMJ, 10 U.S.C. § 825(d)(2); para. 4, MCM, 1969 (Rev.). The Congressional emphasis upon best qualified for the duty, age, education, training, experience, length of service and judicial temperament belie an intention to create courts-martial modelled on the civilian notions of egalitarinism, peer juries and random selection of court members. Absent some concrete evidence that improper criteria were applied to the court-martial member selection process, there is no basis for relief.

## SUFFICIENCY OF EVIDENCE

 The appellant challenges the sufficiency of the evidence to prove the two marijuana use offenses. One incident related to a housewarming party at HM3 Hubbard's quarters. Hubbard's statement to NIS, the testimony of HN Carswell and the testimony of Ensign Berendse contain evidence to support guilt. The in-court testimony of Hubbard, recanting her NIS statement, and other factors bearing on the credibility of Carswell's and Berendse's testimony suggested that the appellant did not use marijuana on this occasion. The second incident, which occurred in July or August of 1983, was proved by Hubbard's statement to NIS and the testimonies of LCDR Purdham and Corporal Henderson, with the credibility of the evidence subject to attack. The evidence is sufficient if there is some competent evidence from which the fact-finder could find beyond a reasonable doubt the existence of each element of the offenses charged. *United States v. Zammit*, 16 M.J. 330, 332 (C.M.A. 1983) (and authorities cited therein). In evaluating the evidence, the evidence must be considered as a whole but it need not be free of inconsistency or conflict. *United States v. Teeter*, 12 M.J. 716, 722 (A.C.M.R. 1981), *aff'd and rev'd in part on other grounds*, 16 M.J. 68 (C.M.A.1983) (and authorities cited therein). The relevant question to be answered is whether, after viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The matter of weight and the credibility of the evidence is worthy of due deference to the trier of fact. *United States v. Doctor*, 7 U.S.C.M.A. 126, 127, 21 C.M.R. 252, 263 (1956). So long as there is substantial evidence of record to support the fact-finder's determinations, the trial court's determinations should not be disturbed. *United States v. Ferenczi*, 10 U.S.C.M.A. 3, 27 C.M.R. 77 (1958). Appellant does not argue that the government's case did not contain competent evidence on each element of the offenses at issue, rather he prays upon the weaknesses of each piece of evidence, overlooking the whole. The appellant seems, at the same time, to disclaim any intention to argue in support of testimony he knows to be perjured while, nonetheless, seeking to benefit from it. The assignment lacks merit. We are convinced of the appellant's guilt beyond a reasonable doubt.

## TRIAL COUNSEL TACTICS

 Appellant's claims that trial counsel engaged in unfair and unethical trial

tactics by intentionally eliciting the perjured testimony of HN3 Hubbard and arguing the existence of that perjury knowing that the defense was ethically prohibited from adopting the truth of the testimony. Appellant's assertion stems from the tactic of the trial counsel in using both Hubbard's incriminating statement to NIS and the live testimony of Hubbard in which she retracted her NIS statement. Appellant cites the civilian ethical standards of the American Bar Association and decided cases in which the knowing use of perjured or false evidence is condemned. Appellant misconstrues the ethical standards involved. An advocate cannot attempt to prosecute a case by presenting false and perjured testimony as being true. Model Code of Professional Responsibility, DR 7–102; EC 7–26 (1979). The standard contemplates that, before the witness testifies, the trial counsel, in the circumstances of the case, knows that the witness is not going to tell the truth but persists in a lie and, thus, is going to commit perjury and that the trial counsel knows necessarily which version of her story—NIS statement or in-court testimony—is true and the advocate seeks to mislead the court. The circumstances presented in this case are not those which the ethical standards prohibit, for the standards patently seek to prohibit the affirmative use of evidence or testimony known to be false, a circumstance tantamount to fraud on the court. Interestingly, even though defense counsel notified the court that it had received perjured testimony, the trial continued. The court-martial members were not informed of the perjury. Appellant acknowledges that the only direct evidence available to him to refute the allegations of marijuana use was the in-court perjured testimony of Hubbard. Presumably defense counsel in pursuit of his ethical obligations would not have put HM3 Hubbard on the stand as a defense witness to elicit that information. The appellant, even though barred from arguing the truth of the testimony which *he* knew to be false, benefitted by having favorable testimony before the court-martial which was otherwise not available to him. The assignment is rejected.

## CONCLUSION

The offenses of possession and use of marijuana were treated as multiplicious for sentencing purposes, but not for findings purposes. The offenses are also multiplicious for findings purposes. Specifications 8 and 10 of Charge III were dismissed on initial review. There is no prejudice attending the error. The findings and the sentence, as approved on review below, are affirmed.

Senior Judge COUGHLIN and Judge DECARLO concur.